# United States Court of Appeals
## For the First Circuit

No. 06-1790

INTERNATIONAL STRATEGIES GROUP, LTD.,

Plaintiff, Appellant,

v.

GREENBERG TRAURIG, LLP, A. JOHN PAPPALARDO, AND
ECKERT, SEAMANS, CHERIN & MELLOTT, LLC,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Selya, Circuit Judge,
Stahl, Senior Circuit Judge,
and Howard, Circuit Judge.

Jessica Block with whom Block & Roos, LLP, was on brief for appellant.
Paul B. Galvani with whom Matthew P. Garvey and Ropes & Gray, LLP, were on brief for appellees Greenberg Traurig, LLP, and Pappalardo.
Martha Born with whom William B. Mallin, Timothy S. Coon, Holland & Knight, LLP, and Eckert Seamans Cherin & Mellott, LLC, were on brief for Eckert, Seamans, Cherin & Mellott, LLC.

March 30, 2007

**STAHL**, **Senior Circuit Judge**.  Plaintiff International Strategies Group, Ltd. ("ISG") brought suit against attorney A. John Pappalardo and two law firms, Greenburg Traurig, LLP ("GT"), Pappalardo's current firm, and Eckert, Seamans, Cherin & Mellott, LLC ("ESCM"), Pappalardo's former firm.  ISG's claims against defendants arose from the loss of roughly $4 million, which it invested with Corporation of the BankHouse ("COB"), a Boston-based investment firm.  Attorney Pappalardo represented COB as it sought to recover about $19 million, including ISG's funds, that COB had lost through a series of fraudulent transfers.

The district court granted summary judgment as to all of ISG's claims against the three defendants, finding a failure to demonstrate causation and to file within the statute of limitations.  We affirm, concluding that summary judgment was appropriate as to ISG's negligence, misrepresentation, breach of fiduciary duty, breach of contract, and 93A unfair trade practices claims because no attorney-client relationship was formed between ISG and any of the defendants.  Further, we hold that ISG's remaining two claims, for conversion, and aiding and abetting fraud and breach of fiduciary duty, fail because they were not filed within the statutory period.  We also affirm the district court's denial of ISG's motion for reconsideration or relief from judgment.

# I. Background

This case involves a complex set of financial transactions involving numerous individuals and entities. We do not delve into every nuance in our recitation of the facts below, but only those necessary to explain our decision. Because we are reviewing a grant of summary judgment, we draw all reasonable inferences in favor of the non-moving party, ISG. Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).

## A. The Scheme

ISG, a Hong Kong-based company, invested $4 million with COB in April 1998, through COB's so-called "Federal Reserve Guarantee Program." COB told potential investors that this program generated profits by controlling the circulation of U.S. dollars. COB promised investors substantial profits, along with a guarantee of non-depletion of their original investment. Having been essentially promised profit at zero risk, ISG transferred its $4 million investment to a COB account at ABN Amro Bank in Belgium on May 15, 1998. Two weeks later, on May 29, 1998, COB made unauthorized transfers of $821,500 of ISG's investment into an ESCM bank account in Pennsylvania, and $328,500 into a COB bank account in Boston. Both transactions violated the non-depletion agreement, and were made without ISG's permission or knowledge.

COB then engaged in a Ponzi scheme, according to ISG's allegations, using funds from new investors to cover the depletion

of funds provided by previous investors, amounting to millions of dollars in ill-gotten gains by COB and a variety of individuals and entities not involved in this suit.  ISG estimates that COB amassed about $19 million dollars through this scheme, and then transferred these funds in November 1998, without the permission of any investor, to an entity called Swan Trust.  Henry Pearlberg, the trustee of Swan Trust, then depleted the Swan Trust account through a series of transactions in late 1998 and early 1999, depositing most of the money ($16.7 million) in an account held by First Merchant Bank ("FMB"), which ISG characterizes as a "rogue Northern Cyprus bank."  Pearlberg also appropriated about $2.3 million for his own use.  ISG alleges that FMB dissipated the $16.7 million account through yet another series of fraudulent transactions from February to May 1999.

In April 1999, COB and its CEO, James Pomeroy, persuaded Pearlberg to execute a Deed of Assignment, which assigned to Pomeroy, as agent for COB, all rights to the misappropriated funds held by FMB, Swan Trust, and Pearlberg.  In July 1999, Pomeroy received a disbursement of $1.2 million from FMB based on this assignment.  These recovered funds were not passed on to the investors, but were retained by COB or Pomeroy and are now dissipated.

**B. Attempts to Recover Dissipated Funds**

In June 1998, ISG had become concerned that COB was not honoring the non-depletion agreement and unsuccessfully sought assurance from COB that its funds were intact. By mid-1999 ISG's director, Phillip Clark, a Hong Kong attorney, was actively investigating COB's handling of ISG's investment. By then, ISG knew that COB had transferred funds to Swan Trust, and that Pearlberg had subsequently transferred the majority of those funds to the FMB account. By this time, ISG also had learned of Pearlberg's assignment to Pomeroy and Pomeroy's recovery of $1.2 million based on the assignment. By April 2000, ISG had learned of COB's initial depletion of its investment -- the May 1998 transfers to the ESCM and COB accounts in the United States.[1]

In July 1999, Pappalardo, then an attorney with ESCM, began representing COB. On August 11, 1999, COB's Pomeroy sent ISG an email detailing COB's "options for retrieval" of the lost funds. Pomeroy also informed ISG that, "I have chosen to move to prepare litigation against the parties utilizing the law firm of Greenberg & Traurig. I have utilized the law firm of Seamin Cherin & Melott [sic] for the criminal assistance against the parties."

---

[1]ISG learned much of this information from its cooperation with a Belgian judge's investigation into the COB fraud. ISG communicated with Belgian authorities on its own, without assistance from Pappalardo. Indeed, during this period, ISG admits that it filed a criminal complaint with the Belgian authorities against a COB employee, Albert Pans. ISG filed this complaint without the assistance of Pappalardo.

During this same period, ISG's Clark flew to Boston to confront COB over the missing funds. When the parties met in Boston, Pappalardo told Clark that he had been retained by COB; that COB was also a victim of the fraudulent scheme; that all necessary steps, including litigation, would be taken to recover the funds; and that any independent action by ISG against COB, Pomeroy, or other parties would jeopardize Pappalardo's negotiations to recover the missing funds. ISG alleges that these representations, and other events that we detail below, led it to believe that Pappalardo was ISG's legal representative and that an attorney-client relationship had been formed.[2]

Pappalardo informed ISG on several occasions that a negotiated recovery of the funds was imminent, as was COB's filing of a civil complaint against the perpetrators of the fraud. When Pappalardo had neither recovered the funds nor filed a complaint in over two years, ISG finally retained outside counsel on November 7, 2001. Through counsel, ISG filed suit against COB and Pomeroy in March 2002. ISG obtained a $10 million judgment in that suit, but the award has proven uncollectible. ISG also filed suit against ABN Amro Bank, FMB, and two individuals associated with COB's scheme. Those suits are currently pending.

_____

[2]ISG alleges that it established three attorney-client relationships, one with each defendant. However, for simplicity, this opinion analyzes only the alleged ISG-Pappalardo relationship, because it is the only hook for ISG's allegations regarding the firms. Pappalardo left ESCM for GT on March 13, 2001.

-6-

## C. Proceedings Below

ISG brought three claims against all three defendants: negligence, in the form of legal malpractice; misrepresentation; and violation of Chapter 93A, the Massachusetts consumer protection law, see Mass. Gen. Laws ch. 93A, § 1 et seq. ISG brought two additional claims against Pappalardo alone, for breach of fiduciary duty and breach of express and implied contract. Finally, ISG brought two claims against ESCM alone, for conversion, and aiding and abetting fraud and breach of fiduciary duty, based on the May 1998 transfer of funds to ESCM's escrow account.

Defendants moved for summary judgment on all counts. The district court declined the defendants' request to grant summary judgment on the ground that no attorney-client relationship was formed. However, holding that ISG had failed to establish a viable theory of causation, the court granted summary judgment as to most of ISG's claims, including negligence, misrepresentation, violation of Chapter 93A, breach of fiduciary duty, and breach of contract. The court also granted summary judgment as to the remaining two claims -- conversion, and aiding and abetting fraud and breach of fiduciary duty -- concluding that the statute of limitations had expired.

ISG filed a motion for reconsideration or relief from judgment, which the district court denied. ISG timely appealed the

district court's grant of summary judgment and denial of its motion for reconsideration.

## II. Analysis

### A. Standard of Review

On appeal, we review a district court's grant of summary judgment <u>de</u> <u>novo</u>, viewing the facts in the light most favorable to the nonmoving party. <u>See</u> <u>Fontánez-Núñez</u> v. <u>Janssen Ortho LLC</u>, 447 F.3d 50, 54 (1st Cir. 2006). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c). An appellate court is not "tied to the district court's rationale," but may affirm a grant of summary judgment "on any ground revealed by the record." <u>Iverson</u> v. <u>City of Boston</u>, 452 F.3d 94, 98 (1st Cir. 2006).

We review a district court's denial of a motion for reconsideration or relief from judgment for abuse of discretion. <u>See</u> <u>Ruíz-Rivera</u> v. <u>Riley</u>, 209 F.3d 24, 27 (1st Cir. 2000). "To obtain relief, the movant must demonstrate either that newly discovered evidence (not previously available) has come to light or that the rendering court committed a manifest error of law." <u>Palmer</u> v. <u>Champion Mortgage</u>, 465 F.3d 24, 30 (1st Cir. 2006).

-8-

**B. Duty of Care**

Most of ISG's claims[3] against defendants are predicated on establishing the existence of an attorney-client relationship or other duty of care between ISG and the defendants, including the claims of negligence,[4] misrepresentation,[5] and violation of Chapter 93A.[6] In addition, ISG's claims against Pappalardo, for breach of fiduciary duty and breach of contract, are also predicated on the existence of an attorney-client relationship or other duty of care between Pappalardo and ISG.[7]

---

[3]All parties agree that Massachusetts law governs ISG's claims. See Moores v. Greenberg, 834 F.2d 1105, 1107 n.2 (1st Cir. 1987) (a federal court "ordinarily should" honor an agreement between the parties as to what substantive law controls).

[4]See Miller v. Mooney, 431 Mass. 57, 725 N.E.2d 545, 549 (2000) (under Massachusetts law "[e]xistence of an attorney-client relationship is an element of a malpractice plaintiff's proof.").

[5]A misrepresentation claim can rest upon an attorney-client relationship, or a duty to a nonclient where "the attorney knows [the nonclient] will rely on the services rendered." Miller, 725 N.E.2d at 550 (quoting Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 536 N.E.2d 344, 350, cert. denied, 493 U.S. 894 (1989)).

[6]In Robertson, the Massachusetts Supreme Judicial Court held that, where a plaintiff's 93A claim alleges unfair or deceptive acts during the course of the defendant's "legal representation of the plaintiff," proof of "an attorney-client relationship between the plaintiff and [defendant] is critical to the plaintiff's 93A claim." 536 N.E.2d at 351. Here, ISG predicated its 93A claim on the existence of an attorney-client relationship with defendants. Specifically, ISG's 93A count alleges that the defendants wrongly "under[took] joint representation" and committed unfair and deceptive acts while "representing ISG."

[7]ISG's complaint alleges the existence of a fiduciary duty based on Pappalardo's "undertaking to represent ISG." Similarly, ISG's claim of breach of express or implied contract is based on

ISG puts forth two theories for the existence of a duty of care by defendants.  First, ISG argues that an attorney-client relationship was in fact formed.  Second, ISG avers that "the forbearance of ISG induced by Pappalardo while at GT and ESCM, created a duty of care."  This second argument is an invocation of the foreseeable reliance exception that, under Massachusetts law, creates a duty of care toward nonclients.  See Sheinkopf v. Stone, 927 F.2d 1259, 1268 (1st Cir. 1991).  Thus, we first examine whether an attorney-client relationship was created in fact; if not, we then consider whether the foreseeable reliance exception for nonclients applies in this case.

1.  Attorney-Client Relationship

Under Massachusetts law, an attorney-client relationship may be shown by an express contract, see Miller, 725 N.E.2d at 549, or may be implied "when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the advice or assistance," DeVaux v. Am. Home Assurance Co., 387 Mass. 814, 444 N.E.2d 355, 357 (1983) (quoting Kurtenback v. TeKippe, 260 N.W.2d 53, 56 (Iowa 1977)).  The third prong of the DeVaux test may be established "by proof of detrimental reliance,

the existence of an obligation by Pappalardo "to use utmost good faith and due care in protecting ISG's interests."

-10-

when the person seeking legal services reasonably relies on the attorney to provide them, and the attorney, aware of such reliance, does nothing to negate it."  Id.

It is not entirely clear whether ISG alleges that an express attorney-client relationship was formed.  Nonetheless, we can easily conclude that this is not the case.  There is no evidence here of a retainer agreement or other contract for legal services between ISG and any of the defendants; nor is there evidence of billing or remittances for such services.

ISG points to the power of attorney that it executed in favor of Pappalardo in July 2000, authorizing him to transfer to an interest bearing escrow account any funds belonging to ISG that he succeeded in recovering from Swan Trust.  However, by executing the power of attorney, ISG granted only a circumscribed agency power to Pappalardo in order to facilitate the physical return of the missing funds.  While the power of attorney may have some impact on our analysis of whether an implied attorney-client relationship was formed, it is certain that such a limited power of attorney did not create an express attorney-client relationship.  See Williams v. Dugan, 217 Mass. 526, 528, 105 N.E. 615 (1914) (noting that a power of attorney creates limited agency relationship as to expressly enumerated powers and no additional powers may be inferred); see also Bachner v. Air Line Pilots Ass'n, 113 F.R.D. 644, 649 (D. Alaska 1987) ("A power of attorney establishes the relationship of

-11-

attorney-in-fact, which is an agency relationship different from the relationship of an attorney-at-law.").

We turn next to ISG's contention that an attorney-client relationship was created by implication, under the DeVaux three-part test. On appeal, ISG contends that, based on Pappalardo's assurance that he represented the interests of the investors and his warnings that filing independent charges would jeopardize his attempts to negotiate a recovery of the funds, ISG reasonably believed that Pappalardo was its attorney and forebore from pursuing independent legal action on that basis. In contrast, the defendants maintain that Pappalardo made clear that he only represented COB, and ISG demonstrated an understanding of this fact; that ISG never relied on Pappalardo for legal services; and that ISG, as a sophisticated, represented entity, understood that its position was potentially adverse to Pappalardo's client, and indeed threatened suit against COB on this basis several times.

Our analysis of whether an implied relationship was created must start with the conjunctive, three-part DeVaux test. Under part one of the test, we ask whether ISG sought legal advice or assistance from Pappalardo. See DeVaux, 444 N.E.2d at 357. Courts interpreting DeVaux have understood this first prong to require concrete communication by the plaintiff requesting that the attorney represent him, or explicitly seeking individualized legal advisement. For example, in Robertson v. Gaston Snow & Ely

-12-

Bartlett, 404 Mass. 515, 536 N.E.2d 344, 351 (1989), the Massachusetts Supreme Judicial Court ("SJC") found no implied attorney-client relationship between a corporate officer and a law firm representing the corporation, where the officer never explicitly requested that the firm represent him regarding his employment status at the corporation after a reorganization. The SJC reached this conclusion even though the officer had previously been a client of the firm in regard to other matters, had numerous discussions with the firm about the corporate reorganization and his future employment with the corporation, and had requested and received a sample employment agreement from the firm. Id. The SJC concluded that an implied relationship cannot be formed without active communication from the plaintiff to the lawyer requesting legal representation or legal advice:

> In spite of several written and many oral communications between the plaintiff and the other participants, the plaintiff introduced no evidence of a specific reference to [the firm] as his personal counsel. His claim is essentially, therefore, that he thought that [the firm] represented him but that he failed to communicate his thought to anyone.

Id. at 349.

Similarly, in Sheinkopf v. Stone, 927 F.2d 1259, 1266-67 (1st Cir. 1991), this court held that no implied attorney-client relationship arose under Massachusetts law between an attorney and an investor, where the investor bought into a joint investment venture managed by the attorney. We reached this result even

-13-

though the attorney prepared various legal documents for the investor's signature and requested that he sign them; promised to "protect" the investor; told the investor that "other clients of [the firm]" were also investing in the venture; listed the firm's address on the joint venture's legal documents; and transacted joint venture business out of his law firm office and with the assistance of his law firm secretary. Id. at 1265-66. This court found particularly persuasive that the investor "never explicitly requested [the attorney] or [the law firm] to represent him, never sought any legal advice from them, and was never billed for services." Id. at 1268.

Here, ISG's claim is in some ways weaker than those of plaintiffs in Robertson and Sheinkopf. Not only is there no evidence or allegation that ISG explicitly requested legal representation from Pappalardo, but on at least two occasions ISG acknowledged that it was not Pappalardo's client. First, in a March 30, 2000, letter, Clark wrote to Pappalardo:

> While I appreciate that you act for Corporation of the Bankhouse (COB), I find that your failure to respond to any of our correspondence insulting and unprofessional. It is not beyond the parameters of your ethical requirements for you to correspond with International Strategies Group (ISG) on COB's instruction.

(emphasis added). Second, on August 15, 2001, having grown more frustrated at Pappalardo's lack of communication and failure to

-14-

recover the funds through negotiation, C.M. Barber, another ISG director, wrote to Pappalardo:

> John, you seem to be testing our resolve to take [independent] action. How do we respond? . . . We can prepare a comprehensive complaint to the Massachusetts State Bar with respect to <u>your treatment of us as third parties</u>, particularly in the circumstances of the Power of Attorney.

(emphasis added). These acknowledgments that Pappalardo did not represent ISG were consistent with Pappalardo's advisement to ISG on at least two occasions that he represented COB alone. Following Pappalardo's first meeting with ISG, he wrote to Clark on August 20, 1999:

> As you know, I am counsel along with others, for Societè Bank House ("C.O.B.") and represent that entity and its employees in connection with certain matters arising from their relationship with Swan Trust and its successors.

Three months later, Pappalardo began a letter to ISG's Barber with a similar notification: "I am writing to you at the request of my client, Corporation of the BankHouse, Incorporated ('COB') in connection with the recovery of funds from the transactions involving the Swan Trust."

In addition, there is no evidence that ISG requested legal advice from Pappalardo respecting ISG's potential individual claims.[8] Such a request would have raised a serious ethical

---

[8]There is evidence that ISG asked Pappalardo on several occasions about the status of COB's potential civil claims to

dilemma for Pappalardo, as one of ISG's foremost claims would have been against COB, Pappalardo's client.  Indeed, in a March 23, 2000, letter to COB, ISG's Clark acknowledged that ISG did not have an attorney-client relationship with COB's attorneys, and therefore prodded COB to consult with its own attorneys regarding the prospects for a COB civil suit:

> [W]e are of the view that the urgent instigation of civil proceedings against Swan Trust, May Davis and others is now a priority.  <u>May we seek your consultation with your civil attorneys as to the process and timing of implementing same.</u>  It is our view that there will be economies in process and costs through the various investors and/or their fiduciary proceeding in concert and together with Corporation of the BankHouse ("CoB") in its separate function as fiduciary to such parties.  <u>There would be a requirement for all such parties to be privy to the benefits of a client relationship with your appointed attorneys.</u>

(emphasis added).  Though ISG here proposed a joint representation of all the investors by COB's attorneys, there is no evidence or

---

recover the funds, including an August 16, 2001, letter from ISG to Pappalardo.  However, ISG asking COB's attorney about potential COB claims is quite different from ISG seeking legal advice from Pappalardo regarding its own potential claims, and is not sufficient to satisfy prong one of <u>DeVaux</u>.  Further, even if such a request for information might in some circumstances satisfy prong one, the record shows, and ISG concedes, that Pappalardo never provided ISG with the information it sought regarding COB's potential civil claims.  Therefore, the third prong of <u>DeVaux</u> -- the provision of the requested legal services -- would not be satisfied, and no implied relationship could be said to have arisen.

even allegation that COB responded to this proposal or took any action to implement it.

In sum, the record indicates that ISG did not explicitly request legal representation from Pappalardo, nor did it seek advice regarding its own legal position vis-à-vis the entities implicated in the fraud. Therefore, we conclude that ISG has set forth insufficient facts to support its claim of an implied relationship under part one of the DeVaux test.

We turn next to the third prong of the DeVaux test,[9] and ask whether Pappalardo expressly or impliedly agreed to give or actually gave the requested advice or assistance. See DeVaux, 444 N.E.2d at 357. This prong may be satisfied if ISG reasonably relied on Pappalardo to provide legal services, and Pappalardo, aware of such reliance, did nothing to negate it. Id.

The reasonable reliance test captures the essence of ISG's allegation that an implied relationship was created. ISG argues that Pappalardo urged it not to proceed on its own, but rather to wait for Pappalardo to orchestrate a negotiated return of the missing funds on behalf of the "team" of investors; therefore, the argument goes, ISG reasonably relied on Pappalardo to provide legal services, and Pappalardo, aware of this reliance, did nothing

_____

[9]We temporarily skip prong two of DeVaux as our analysis of prong three will shed considerable light on the outcome under prong two. We revisit prong two at the end of this section.

-17-

to negate the impression that he was acting as ISG's attorney. However, the facts before us do not support this account.

The problem with ISG's allegation here is that no evidence suggests that ISG was relying on Pappalardo to provide ISG with legal services. Instead, all the evidence suggests that ISG was relying on Pappalardo to recover the funds for COB, with the expectation that ISG would be an eventual financial beneficiary of such a recovery. Pappalardo told ISG that, in his opinion, his negotiations were more likely to lead to a recovery of the missing funds if ISG refrained from filing its own charges. This was a strategic opinion from the attorney of a potential adversary, which ISG was free to accept at face value, ignore, or seek legal advice regarding. ISG chose to forego its own action, expecting to benefit financially from a successful COB recovery. However, ISG's anticipated financial benefit does not transform Pappalardo's legal work on behalf of COB into a duty to ISG. Nor does ISG's expectation of an eventual financial recovery support the notion that it was reasonable for ISG to rely on Pappalardo for legal services.

This situation is analogous to one the SJC confronted in Spinner v. Nutt, 417 Mass. 549, 631 N.E.2d 542 (1994). There, trust beneficiaries brought suit against the attorneys for the estate's trustees. The SJC found no duty of care as between the estate's attorneys and the estate's beneficiaries: "The fact that

-18-

third parties are thus benefitted, or damaged, by the attorney's performance does not give rise to a duty by the attorney to such third parties, and hence cannot be the basis for a cause of action by the third parties for the attorney's negligence." Id. at 546 (quoting Goldberg v. Frye, 266 Cal. Rptr. 483, 489 (Cal. Ct. App. 1990)). The SJC concluded that, "In these cases the third parties are incidental beneficiaries, and '[a]n incidental benefit does not suffice to impose a duty upon the attorney.'" Id. (quoting Ronald E. Mallen and Jeffrey M. Smith, 1 Legal Malpractice § 7.11 (3d ed. 1989)).

Similarly here, where ISG relied on Pappalardo to recover the missing money on behalf of COB, rather than to provide ISG directly with legal counsel, ISG put itself in the position of an incidental third-party financial beneficiary, and therefore no implied attorney-client relationship was established. ISG relied on Pappalardo only to recover the missing funds for COB, not to provide ISG with legal services.

Furthermore, assuming arguendo that ISG did rely on Pappalardo to provide direct legal services, no reasonable factfinder could conclude that ISG's reliance in this regard was reasonable. ISG attempts to rebut this conclusion by pointing to several pieces of evidence, including three statements made by Pappalardo. ISG notes that: (1) Pappalardo sent ISG an "action plan" for recovery of the funds which noted that he "represent[ed]

-19-

the team," comprised of the investors and COB; (2) Pappalardo told ISG that COB and ISG's interests were "one and the same"; and (3) Pappalardo told ISG that he was preparing a civil suit against the fraudulent parties "to protect [ISG's] interest."

However, these comments must be analyzed in the broader context of the parties' course of dealing. As discussed above, Pappalardo had told ISG on several occasions that he represented COB alone, and ISG made several statements which indicated its understanding of this arrangement. Also, ISG had chosen to forebear in bringing its own legal action, hoping instead that Pappalardo's negotiations on behalf of COB would succeed, resulting in an eventual financial benefit to ISG. Finally, ISG was aware of its ability to bring suit against COB and Pomeroy, and reminded Pappalardo and COB of this fact on several occasions.

Evaluating the three statements cited by ISG in this larger context, we conclude that ISG's alleged reliance was not reasonable. First, Pappalardo's statement in the "action plan" that he represented the investors as a team simply reflected the reality that ISG had chosen to coordinate its strategy with COB by deferring individual action in favor of Pappalardo's efforts to recover the funds for COB. Pappalardo's statement that he represented the team is even less problematic than that made by the attorney in Sheinkopf, who told an investor that "other clients of [the firm]" were also investing in the attorney's venture. 927

F.2d at 1265. We were unpersuaded in Sheinkopf that that statement was a reasonable basis for an implied relationship. In this case, Pappalardo's statement accurately reflected a choice made by ISG to forebear in favor of Pappalardo's efforts on COB's behalf.

Second, Pappalardo's statement that the interests of his client and ISG were one and the same also did not form a reasonable basis for ISG's reliance on Pappalardo for legal services. As discussed above, ISG had threatened to sue COB and Pomeroy on several occasions, indicating that it was well aware that their interests were not fully aligned.

Third, when read in the context of the entire letter, Pappalardo's statement that he was preparing a civil suit on behalf of COB in order to "protect [ISG's] interest" also does not provide a reasonable basis for ISG's reliance. ISG highlights just one sentence in the October 22, 1999, letter from Pappalardo to ISG: "To also protect your interest and as part of pursuing our position for collection, COB has been preparing its own civil fraud case against the US based parties." It is a sign of the tenuousness of ISG's claim that the sentence it chose to highlight contains a clear statement by Pappalardo that the civil suit would be brought solely on behalf of his client, COB. Further, because ISG knew that the suit would be brought on behalf of COB alone, it is clear that the "interest" that Pappalardo referred to was simply ISG's recovery of its investment funds as an incidental beneficiary of

-21-

the lawsuit. This is particularly so given that the same letter began, "I am writing to you at the request of my client, Corporation of the BankHouse Incorporated ("COB") . . ." and the second paragraph stated:

> As our client is bound by confidentiality agreements, I am reluctant to share specifics of the details or process, for fear of jeopardizing the sensitive arrangements involved or breaching specific confidentiality agreements that are integral to the matters involved. However, I want to provide you with an understanding of the actions that are being taken on behalf of COB.

(emphasis added).

ISG also points to the power of attorney and accompanying "side letter" as grounds for its alleged reasonable reliance on Pappalardo for legal services. As discussed above, the power of attorney granted to Pappalardo the limited agency right to transfer any recovered ISG funds to an interest-bearing escrow account. The "side letter" was drafted by ISG and given to Pappalardo along with the signed power of attorney. It read:

> The Directors of ISG seek to . . . clarify . . . that the captioned Power of Attorney is given to [ESCM and Pappalardo] upon the understanding that it will be actioned by the attorney with the utmost good faith and due care having regard to the interests of ISG.

The "side letter" simply reiterated the duty of care that accompanies any agency relationship and did not expand the very limited grant of authority contained in the power of attorney. No reasonable factfinder could conclude that ISG, a sophisticated

-22-

entity, was reasonable to rely on Pappalardo to provide broad legal services simply because it appointed him attorney-in-fact for the limited purpose of transferring funds. Indeed, in an August 2001 letter to Pappalardo, ISG acknowledged that it remained a nonclient third party even after the power of attorney was signed.[10]

Therefore, we hold that ISG's claim fails the third prong of DeVaux because ISG did not rely on Pappalardo for legal services, but merely for incidental financial benefit. Further, we conclude that even if ISG did rely on Pappalardo for legal services, such reliance was not reasonable given the parties' course of dealings.

We also briefly note that these conclusions are fatal to ISG's claim under prong two of DeVaux, which requires the plaintiff to have sought advice or assistance on a matter within the attorney's professional legal competence. See DeVaux, 444 N.E.2d at 357. As we noted in Sheinkopf, attorneys "routinely wear a multitude of hats," 927 F.2d at 1265, and mere interaction with an attorney for assistance of any kind is not enough under DeVaux. The assistance sought must be legal in nature. The facts here show that ISG relied on Pappalardo only for a financial benefit. ISG

---

[10]In the August 15, 2001, letter, ISG threatened to file ethics charges against Pappalardo for his "treatment of [ISG] as third parties, particularly in the circumstances of the Power of Attorney."

having failed all three prongs of the <u>DeVaux</u> test, we conclude that no implied attorney-client relationship was created.

2. Foreseeable Reliance Exception for Nonclients

Generally, under Massachusetts law, an attorney only owes a duty of care to clients. See <u>One Nat'l Bank</u> v. <u>Antonellis</u>, 80 F.3d 606, 609 (1st Cir. 1996) ("'[A]n attorney's liability for negligence arises out of a duty owed to a client.'") (quoting <u>Norman</u> v. <u>Brown, Todd & Heyburn</u>, 693 F.Supp. 1259, 1265 (D. Mass. 1988)). However, Massachusetts courts have carved out a limited "foreseeable reliance" exception to this rule, which creates a duty to nonclients where the attorney knew, or should have reasonably foreseen, that the nonclient would rely on his services. See <u>Antonellis</u>, 80 F.3d at 609; <u>Sheinkopf</u>, 927 F.2d at 1268. Nonetheless, this duty will not be imposed if "such an independent duty would potentially conflict with the duty the attorney owes to his or her client." <u>Antonellis</u>, 80 F.3d at 609 (quoting <u>Lamare</u> v. <u>Basbanes</u>, 418 Mass. 274, 636 N.E.2d 218, 219 (1994)).

ISG invokes this nonclient exception to no avail, for the simple reason that ISG and COB were potentially adverse parties. Imposing on Pappalardo a duty to ISG would create a potential conflict with Pappalardo's preexisting duty to COB, his client. See <u>id.</u> ("Massachusetts and federal case law has consistently found that a potential conflict between an attorney's duty to his or her

-24-

client and the alleged duty to the nonclient is sufficient to defeat the nonclient's malpractice claim.").

ISG and COB were potentially adverse parties since ISG invested in COB's scheme. ISG became aware of an actual conflict with COB when it began investigating the fraudulent transfers in early 1999. In a letter to COB sent in early 1999, before Pappalardo was hired, ISG bitterly complained that COB was not keeping ISG apprised of its account positions, and threatened to pursue legal actions if COB "had been in any way misleading or inaccurate" regarding the funds:

> You seem to be under the mistaken impression
> that I am posturing with respect to the need
> for ISG to consider it's [sic] legal options.
> I should clarify perhaps that [ISG directors]
> could well be taken to task with regard to our
> failure to take local state legal advice.

Given this very real conflict between ISG and COB, we decline to impose on Pappalardo a duty to ISG as a nonclient.

Therefore, because we have determined that no reasonable factfinder could conclude that an attorney-client relationship was created, either expressly or by implication, and that no duty of care was owed to ISG as a nonclient, we conclude that summary judgment was appropriate as to the five counts[11] predicated upon the existence of such a duty.

---

[11]See _supra_, Part II.B.

## C. The Remaining Claims

Two claims remain -- conversion, and aiding and abetting fraud and breach of fiduciary duty, both brought against ESCM alone. ISG bases these claims on COB's unauthorized transfer of $821,500 of ISG's investment to an ESCM account on May 29, 1998. Both claims against ESCM sound in tort, see Gallagher v. R.E. Cunniff, Inc., 314 Mass. 7, 49 N.E.2d 448, 449 (1943) (conversion); Arcidi v. Nat'l Ass'n of Gov't Employees, Inc., 447 Mass. 616, 856 N.E.2d 167, 173 (2006) (aiding and abetting breach of fiduciary duty), meaning the claims are subject to a three-year statute of limitations, see Mass. Gen. Laws ch. 260, § 2A ("Except as otherwise provided, actions of tort, actions of contract to recover for personal injuries, and actions of replevin, shall be commenced only within three years next after the cause of action accrues.").

Massachusetts courts have said that a tort claim accrues when the plaintiff knew or should have known of the alleged injury. See Joseph A. Fortin Constr., Inc. v. Mass. Hous. Fin. Agency, 392 Mass. 440, 466 N.E.2d 514, 516 (1984) ("[I]t is a well-settled rule that causes of action in tort generally accrue under G.L. c. 260, § 2A, at the time the plaintiff is injured."); Hendrickson v. Sears, 365 Mass. 83, 310 N.E.2d 131, 135 (1974) ("[A] cause of action accrues on the happening of an event likely to put the plaintiff on notice.").

The defendants assert that the limitations period began to run in April 2000, when ISG learned of the transfer of funds to ESCM's account.[12] Citing the doctrine of continuous representation, ISG argues that the limitations period should be equitably tolled during the period that ISG was allegedly represented by Pappalardo. See Murphy v. Smith, 411 Mass. 133, 579 N.E.2d 165, 167 (1991) (the continuing representation doctrine "tolls the statute of limitations in legal malpractice actions where the attorney in question continues to represent the plaintiff's interests in the matter in question"). Thus, ISG suggests that the statutory period did not begin to run until October 2001, when ISG "disengaged entirely from its relationship with Pappalardo and his firms."

Because we have determined that no attorney-client relationship existed between ISG and Pappalardo, the continuous representation doctrine clearly is not applicable here. Therefore, ISG's claims accrued in April 2000, when it first learned of its injury. Because more than three years elapsed between April 2000 and the filing of this action on June 30, 2004, ISG's claims were

---

[12]It is clear from the record that ISG had actual notice of this transfer by April 17, 2000. On that date, ISG faxed to Pappalardo a summary of the information it had learned from a Belgian judge who was investigating the fraudulent transfers. The document presents a timeline of eight separate unauthorized transfers of ISG funds by COB, including the first on the list: "29th of May 1998: USD 821.500 to MELLON BANK, Pittsburgh, USA . . . holder ECKERT DEMANS [sic] CHERIN & MELLOT."

not timely filed, and the district court correctly granted summary judgment on this basis.

## D. Motion for Reconsideration or Relief from Judgment

We also affirm the district court's rejection of ISG's motion for reconsideration or relief from judgment. ISG's motion for reconsideration, which we review for abuse of discretion, see Barrett v. Lombardi, 239 F.3d 23, 28 (1st Cir. 2001), consisted only of "theories previously advanced and rejected," Palmer v. Champion Mortgage, 465 F.3d 24, 30 (1st Cir. 2006), and arguments unrelated to the grounds upon which we found summary judgment to be appropriate.

## III. Conclusion

For the foregoing reasons we affirm the district court's grant of summary judgment in favor of defendants as to all of ISG's claims. Costs to appellees.