10-1581-cv
Int'l Strategies Grp., Ltd. v. Ness

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2010

(Argued: April 8, 2011     Decided: July 15, 2011)

Docket No. 10-1581-cv

- - - - - - - - - - - - - - - - - - - - -x

INTERNATIONAL STRATEGIES GROUP, LTD.,

<u>Plaintiff-Appellant</u>,

- v.-

PETER S. NESS,

<u>Defendant-Appellee</u>.

- - - - - - - - - - - - - - - - - - - - -x

Before:        JACOBS, <u>Chief Judge</u>, CABRANES, <u>Circuit Judge</u>, KRAVITZ, <u>District Judge</u>.[*]

Plaintiff-Appellant International Strategies Group, Ltd. appeals from a March 31, 2010 judgment of the United States District Court for the District of Connecticut (Chatigny, <u>J.</u>), granting Defendant-Appellee Peter Ness's motion to dismiss the complaint as untimely. The claims, alleging breach of fiduciary duty, intentional

---

[*] The Honorable Mark R. Kravitz, of the United States District Court for the District of Connecticut, sitting by designation.

misrepresentation, negligent misrepresentation, and conspiracy to commit those three offenses, arose from the loss of a $4 million investment that the plaintiff made with Ness's employer.  We agree with the district court that the claims are untimely and that tolling is unwarranted.

AFFIRMED.

KATHLEEN C. STONE, Boston, MA, for Plaintiff-Appellant.

ROBERT C. E. LANEY, (Claire E. Ryan, on the brief), Ryan Ryan Deluca LLP, Stamford, CT, for Defendant-Appellee.

DENNIS JACOBS, Chief Judge:

Plaintiff International Strategies Group, Ltd. ("ISG") appeals from a March 31, 2010 judgment of the United States District Court for the District of Connecticut (Chatigny, J.), granting Defendant Peter Ness's motion to dismiss as untimely ISG's complaint, which alleges breach of fiduciary duty, intentional misrepresentation, negligent misrepresentation, and conspiracy to commit those three offenses.  ISG's claims arose from the loss of a $4 million investment it made with Ness's employer, Corporation of the BankHouse ("BankHouse").  The district court ruled that tolling of the untimely claims, on the basis of Ness's

continuing concealment, was unwarranted.  We affirm on the ground that this lawsuit, commenced in April 2004, arises from an injury suffered no later than June 2000, and is therefore barred by the applicable statute of repose, Conn. Gen. Stat. § 52-577.

**BACKGROUND**

We recount only the facts that bear upon the issues necessary to decide the appeal, and assume (as we must) that all plausible allegations in ISG's first amended complaint are true.  Where appropriate, we take judicial notice of filings from ISG's related lawsuits.  See Scherer v. Equitable Life Assurance Soc'y of the U.S., 347 F.3d 394, 402 (2d Cir. 2003).

The defendant, Peter S. Ness, was the Vice President of Corporate Finance at BankHouse, as well as an in-house counsel and the head of the Greenwich office.  Ness was one of a core group of senior executives for entities controlled by James F. Pomeroy, II.  BankHouse, and several other Pomeroy-controlled entities, purported to offer a sophisticated investment opportunity but was in essence a Ponzi scheme.

Around April 1998, Pomeroy enticed ISG to invest $4 million with BankHouse by promising guaranteed profits of $2 million *every twelve days* for three months,[1] with an express covenant that invested funds would not be depleted. Although Pomeroy assured ISG that profits were accruing as expected, ISG's funds were soon depleted through various unauthorized transfers.

BankHouse prolonged the scheme by tantalizing ISG with some or all of its notional profits--in the form of a $9 million promissory note. Around October 1998, Ness and Pomeroy proposed that ISG forgo the payment by note and instead participate in another investment opportunity. ISG knew nothing about this proposed investment,[2] but agreed

---

[1] See App. at 68 (Funds Management Agreement). Although ISG did not attach the Funds Management Agreement to its complaint or its opposition to Ness's motion to dismiss, it "reli[ed] on the terms and effect of [the agreement] in drafting the complaint" by alleging that the investment created fiduciary duties, see Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); it also filed the agreement in its suit against BankHouse, see Barber Aff. Ex. A, Int'l Strategies Grp., Ltd. v. Corp. of the BankHouse, Inc., No. 02-cv-10532 (D. Mass. May 15, 2002). The agreement may therefore be considered in this appeal.

[2] ISG's pleadings are inconsistent as to whether it knew that funds would be transferred to another entity. Compare First Am. Compl. ¶ 25 ("[ISG] agreed to allow what it believed to be an augmented investment amount to be transferred to another entity, Swan Trust, for further

4

nevertheless.  BankHouse then transferred $19 million of its clients' money to a foreign entity, Swan Trust, which included any remnant of ISG's investment.

The funds that BankHouse transferred to Swan Trust were swiftly distributed (unlawfully) to third-party bank accounts.  BankHouse concealed the depletion from ISG for a time: In January 1999, Ness sent a memorandum informing Chris Barber, a Managing Director of ISG, that funds invested with Swan Trust were expected to yield profits of 200% to 300%, which would be disbursed to BankHouse by the end of the month.[3]  At some point prior to June 2000, however, ISG learned that Swan Trust had dissipated the funds.  (ISG's filings reflect an unimportant inconsistency on the timing.[4])

---

investment."), with Pl.'s Opp. to Def.'s Mot. to Dis. at 6 ("At the time, ISG had no knowledge of Swan Trust . . . .").

[3] This and subsequent communications from Ness are properly considered because they were referenced (either specifically or as a course of conduct) in the complaint and were attached *by ISG* to its opposition to Ness's motion to dismiss.  First Am. Compl. ¶ 29; Pl.'s Opp. to Def.'s Mot. to Dis. Ex. E; cf. Chambers, 282 F.3d at 153.

[4] ISG's complaint concedes knowledge of the dissipation only as of June 2000.  First Am. Compl. ¶ 36.  Its opposition to Ness's motion to dismiss, however, admits knowledge since August 1999.  Pl.'s Opp. to Def.'s Mot. to Dis. at 10; see also Complaint ¶ 90, Int'l Strategies Grp., Ltd. v. Corp. of the BankHouse, Inc., No. 02-cv-10532 (D.

The complaint alleges that BankHouse undertook (or pretended to undertake) efforts to recover the funds from Swan Trust, as a ploy to dissuade ISG from bringing a claim. As part of the deception, ISG cites two memoranda that Ness co-wrote to it in October 1999 ("the October 1999 Memoranda"), which optimistically described the recovery efforts conducted by BankHouse's attorneys and its "recovery specialists," but stressed the need for confidentiality. See Pl.'s Opp. to Def.'s Mot. to Dis. Exs. F, G.  ISG was lulled: Although the memoranda suggested an imminent recovery, ISG waited for months while the recovery efforts unfolded.

Approximately nine months later, ISG (and other investors) accepted BankHouse's suggestion to grant a power of attorney to BankHouse's outside counsel, A. John Pappalardo, to act on its behalf in the recovery efforts. Efforts by Pappalardo continued from mid-2000 through the fall of 2001, during which time (as ISG alleges generally) BankHouse and "its employees and agents" deceived ISG by insisting "that they were doing everything feasible to

Mass. Mar. 22, 2002).

The discrepancy is unimportant because the result is the same even if the June 2000 date is used.

recover the funds" and that independent action would "interfere with [BankHouse's] ability to recover on behalf of the investors."  First Am. Compl. ¶ 43.

On August 15, 2001, nearly two years after the October 1999 Memoranda he co-drafted, Ness faxed a single-page, handwritten note (the "August 2001 Fax") to Chris Barber of ISG, in evident response to an inquiry by ISG:

> *Chris--*
>
> - *Discussed your letter with Jim* [Pomeroy]
>
> - *Will get letter to you ASAP from me (with John* [Pappalardo] *OK) or from John---*
>
> - *We are proceeding with first steps of litigation ---*
>
> *Peter*

Pl.'s Opp. to Def.'s Mot. to Dis. Ex. H.  ISG claims that it first realized that the recovery efforts were futile (or perhaps fictitious) after the promises in this fax went unfulfilled.

After a few more months, ISG hired its own counsel to recover its funds through litigation.  Several additional months later, on March 22, 2002, ISG commenced a suit against BankHouse, Pomeroy, and various other Pomeroy-

7

controlled entities to recover its investment funds.[5]  Ness

was not named a defendant or mentioned in the complaint.

The defendants answered, but later ceased to defend.  After

more than two years of litigation, ISG won a default

judgment of over $10 million in damages and penalties.[6]

ISG's inability to collect on its judgment triggered

additional lawsuits.  This suit was filed on April 27, 2004

in the United States District Court for the District of

Connecticut.  Three days later, a nearly identical suit was

filed in the United States District Court for the District

of Massachusetts against Stephen Heffernan, the Chief

Financial Officer of BankHouse, alleging (among other

claims) the same six causes of action as alleged in this

suit.[7]  Ness was not mentioned in the complaint.  The suit

against Heffernan was dismissed as untimely.[8]

---

[5] See Complaint, Int'l Strategies Grp., Ltd. v. Corp. of the BankHouse, Inc., No. 02-cv-10532 (D. Mass. Mar. 22, 2002).

[6] See Amended Judgment, Int'l Strategies Grp., Ltd. v. Corp. of the BankHouse, Inc., No. 02-cv-10532 (D. Mass. June 3, 2004).

[7] See Complaint, Int'l Strategies Grp., Ltd. v. Heffernan, No. 04-10863 (D. Mass. Apr. 30, 2004).

[8] See Memorandum of Decision, Int'l Strategies Grp., Ltd. v. Heffernan, No. 04-10863 (D. Mass. July 30, 2004), ECF No. 11; App. at 60-63.  The court ruled that the repose

While this suit (against Ness) and the suit against Heffernan were pending, ISG began suing third parties involved in the transactions. In May and June 2004, ISG sued two banks involved in the transfers.[9] In September 2004, ISG sued Pappalardo and his current and prior law firms, claiming malpractice in connection with the power of attorney it granted him.[10] Pappalardo and the firms prevailed on summary judgment: Each claim was held either meritless (because no attorney-client relationship was formed) or untimely.[11]

period began in 1999, when ISG knew all the facts giving rise to its claim (after BankHouse and its CEO represented to ISG that its funds were about to be returned); under Massachusetts law, ISG's knowledge that its funds were dissipated precluded tolling.

[9] See Complaint, Int'l Strategies Grp., Ltd. v. ABN AMRO Bank N.V., No. 04-601604 (Sup. Ct. N.Y. County May 27, 2004); Complaint, Int'l Strategies Grp., Ltd v. ABN AMRO Bank N.V., No. 04-601731 (Sup. Ct. N.Y. County June 7, 2004). Ness is mentioned in only one paragraph in each complaint (concerning the $9 million promissory note). The cases, which were consolidated, have apparently been dismissed pursuant to a stipulated order.

[10] See Complaint, Int'l Strategies Grp., Ltd. v. Greenberg Traurig, LLP, No. 04-cv-12000 (D. Mass. Sept. 16, 2004). Ness was mentioned once in the complaint, in connection with the August 2001 Fax.

[11] See Int'l Strategies Grp., Ltd. v. Greenberg Traurig, LLP, 482 F.3d 1 (1st Cir. 2007), aff'g on other grounds No. 04-cv-12000, 2006 U.S. Dist. LEXIS 3401 (D. Mass. Jan. 30, 2006).

After the other suits had concluded, the district court in this case granted Ness's motion to dismiss the action as untimely, ruling that the limitations period began to run by June 2000 and that tolling was unwarranted.

**DISCUSSION**

We review <u>de novo</u> a district court's dismissal of an action under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. <u>Selevan v. N.Y. Thruway Auth.</u>, 584 F.3d 82, 88 (2d Cir. 2009). To avoid dismissal, ISG's allegations "must be enough to raise a right to relief above the speculative level." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). Assuming all "well-pleaded factual allegations" to be true and drawing all reasonable inferences in ISG's favor, we "determine whether [the allegations] plausibly give rise to an entitlement to relief." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1950 (2009).

**I**

Tort actions under Connecticut law are (with exceptions not relevant here) subject to the three-year statute of repose that "begins with the date of the act or omission

10

complained of, not the date when the plaintiff first discovers an injury." Piteo v. Gottier, 112 Conn. App. 441, 445 (App. Ct. 2009) (internal quotation marks omitted); see Conn. Gen. Stat. § 52-577; Barrett v. Montesano, 269 Conn. 787, 794 (2004) (noting that Conn. Gen. Stat. § 52-577 is among the statutes that the Connecticut Supreme Court has referred to as "statutes of limitations" even though they "technically function more like statutes of repose").

ISG's funds were unlawfully dissipated by June 2000, the point by which ISG concedes knowledge of the dissipation in the present complaint. See First Am. Compl. ¶ 36. The present suit was filed on April 27, 2004, nearly four years later. ISG argues that its claims are nevertheless timely, because Ness's actions amounted to a "continuing course of conduct" through August 2001, thereby "allowing [it] to commence [its] lawsuit at a later date."[12] Sherwood v. Danbury Hosp., 252 Conn. 193, 203 (2000) (internal quotation

---

[12] To the extent that ISG argues that Ness's actions from 1999 to 2001 give rise to separate causes of action for misrepresentation and breach of fiduciary duty, it is duplicative of the "continuing course of conduct" argument. In any event, ISG did not raise this argument before the district court, and "[i]n general, a federal appellate court does not consider an issue not passed upon below." See Booking v. Gen. Star Mgmt. Co., 254 F.3d 414, 418 (2d Cir. 2001) (internal quotation marks omitted).

marks omitted).

At the threshold, Ness argues that a course of conduct cannot toll the repose period beyond the plaintiff's discovery of the injury. See, e.g., Rosato v. Mascardo, 82 Conn. App. 396, 405 (App. Ct. 2004). The cases he cites interpret a different statute of limitations (Conn. Gen. Stat. § 52-584), one that contains a separate two-year limitation triggered when an injury is "first sustained or discovered." However, at least one Connecticut trial court has indicated that this proposition from Rosato is nevertheless equally applicable to § 52-577, and the knowledge of the injury may well deny a plaintiff (with a claim subject to that provision) the benefit of the continuous course of conduct doctrine. See Coss v. Stewart, Civ. No. 08-5007541-S, 2010 WL 1050534, at *6 n.1 (Conn. Super. Ct. Feb. 11, 2010), aff'd, 126 Conn. App. 30 (App. Ct. 2011). It is possible that the wording in Rosato may signify only that the separate two-year limitation will already have begun running at that point. But we need not resolve the issue, because even if the continuous course of conduct doctrine were available for the period following the discovery of the actionable harm, ISG has not plausibly

12

alleged facts warranting its application.

"To support a finding of a 'continuing course of conduct' . . . there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto."  Fichera v. Mine Hill Corp., 207 Conn. 204, 209 (1988).  A plaintiff can show a "duty that remained in existence" by establishing: (A) "a special relationship between the parties giving rise to such a continuing duty," or (B) "some later wrongful conduct of a defendant related to the prior act."  Id. at 209-10.

**A**

ISG's conclusory claim that BankHouse's "superior knowledge, skill and expertise" and acceptance of ISG's funds created a fiduciary bond *with Ness* is not a plausible allegation of a "special relationship between the parties" giving rise to a continuing duty.  Id. at 210; see First Am. Compl. ¶ 14.  The Connecticut Supreme Court recognizes that "not all business relationships implicate the duty of a fiduciary," and that "certain relationships, as a matter of law, do not impose upon either party the duty of a fiduciary."  Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255

13

Conn. 20, 38 (2000). Because the present suit is against Ness in his personal capacity, the inquiry must focus on ISG's dealings with Ness rather than its dealings with other BankHouse agents, or with the firm itself.

ISG does not allege that Ness had any role in the solicitation of ISG's investment, First Am. Compl. ¶ 13, or that he presented himself as an investment manager. ISG merely claims that "from time to time" Ness "held himself out as having experience and expertise in financial and investment matters." First Am. Compl. ¶ 4. Nor does ISG claim that Ness offered to perform a key role in its investing relationship with BankHouse or that he purported to have superior knowledge about investments made by BankHouse or ISG. See Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin, 247 Conn. 48, 57 (1998). Absent a representation that Ness had "superior knowledge, skill or expertise" or that he "sought the plaintiff's special trust," there can be no breach of fiduciary duty under Connecticut law. Id. Whether or not BankHouse owed a fiduciary duty to ISG, Ness's fiduciary duties--if any--ran to BankHouse by virtue of his officership. See First Am. Compl. ¶ 11.

14

**B**

ISG has also not plausibly alleged that tolling is warranted on account of "some later wrongful conduct . . . related to the prior act" *by Ness*.  Fichera, 207 Conn. at 210.  Conclusory allegations are made about BankHouse and its "employees and agents," but the only alleged misrepresentations attributed to Ness after 1999 are stray remarks from the August 2001 Fax, most notably that "We are proceeding with first steps of litigation."  (Ness's failure to inform ISG of the repose period cannot establish a course of conduct because, as discussed above, Ness had no special relationship with ISG.)

A single-page, handwritten fax sent twenty months after any other alleged misrepresentation by Ness does not plausibly link up to form a continuous course of conduct. If a plaintiff's miscellaneous, discontinuous interactions with a defendant over an extended period of time alone justified tolling, it "would render the repose part of [a] statute of limitations a nullity," Nieves v. Cirmo, 67 Conn. App. 576, 587 (App. Ct. 2002), and "would, in effect, allow the plaintiff to acquiesce in the defendant's conduct for as

15

long as convenient to the plaintiff, contrary to one of the purposes of statutes of limitations, which is to prevent the unexpected enforcement of stale claims concerning which the persons interested have been thrown off their guard by want of prosecution," Rivera, 45 Conn. Supp. at 160 (internal quotation marks omitted).

Moreover, Ness's fax was not unprompted: It was apparently in response to an inquiry by ISG.  App. at 164 (reflecting Ness's assurance that he "[d]iscussed [ISG's] letter with Jim [Pomeroy]").  A plaintiff does not have a unilateral option to extend the repose period of its claims merely by making an inquiry that can be expected to elicit a reply.  Cf. Sanborn v. Greenwald, 39 Conn. App. 289, 297 (App. Ct. 1995) ("A plaintiff should not be allowed to keep a legal malpractice action alive after the lawyer-client relationship has ended by telephoning the attorney every three years to obtain verification that something the attorney had drafted previously would not cause the plaintiff harm.").

## II

ISG argues that even if its claims were untimely, Ness

16

should be equitably estopped from asserting a repose defense because he discouraged ISG from pursuing its remedies. Ness cites our dicta concerning the unavailability of equitable tolling under Conn. Gen. Stat. § 52-577 as establishing a "well-settled" principle that equitable estoppel is inapplicable as well. Ness Br. at 11; <u>Gerena v. Korb</u>, 617 F.3d 197, 206 (2d Cir. 2010). But that argument ignores the differences between equitable tolling and equitable estoppel. See <u>Bennett v. United States Lines</u>, 64 F.3d 62, 65-66 (2d Cir. 1995). In any event, a recent Connecticut Appellate Court case indicates that equitable estoppel may be available under § 52-577. See <u>Coss v. Steward</u>, 126 Conn. App. 30, 41-45 (App. Ct. 2011).

Equitable estoppel in Connecticut has two elements: (1) "the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief"; and (2) "the other party must change its position in reliance on those facts, thereby incurring some injury." <u>Connecticut Nat'l Bank v. Voog</u>, 233 Conn. 352, 366 (1995) (internal quotation marks omitted). "[A] person who claims an estoppel must show that he has exercised due diligence to

17

know the truth, and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge." Id. at 367 (internal quotation marks omitted).

ISG has not plausibly alleged that it exercised due diligence or changed its position based on Ness's representations. The August 2001 Fax was vague, cursory, informal, and otherwise without indicia of reliability. A diligent party would not have depended on it, at least not without demanding reliable confirmation. Moreover, the (at least) twenty-month gap between the fax and Ness's previous alleged misrepresentations defeat any claim that ISG relied upon Ness for periodic status updates to assess whether to forbear bringing suit. (To the contrary, ISG was relying on Pappalardo to execute its recovery efforts through the power of attorney it granted him.)

Under Connecticut law, ISG's knowledge by June 2000 that its funds were dissipated necessarily informed it that Ness's earlier representations were untrue. First Am. Compl. ¶¶ 29, 32, 36. ISG's credulous faith in Ness's subsequent assurances fell well short of diligence;[14] there

---

[14] ISG argues that the district court improperly found facts concerning (inter alia) ISG's sophistication, and

is "no reason to encourage investors who suspect something amiss to rely solely on their [advisor's] advice and to refrain from seeking outside advice."  Piteo v. Gottier, 112 Conn. App. 441, 449 (App. Ct. 2009).  ISG "cannot seek the safe harbor of equitable estoppel due to [its] own failure to recognize that [it] w[as] required to pursue [its] action."  Celentano v. Oaks Condo. Ass'n, 265 Conn. 579, 615 (2003).

For the foregoing reasons, the judgment of the district court is affirmed.

---

prematurely required it to prove due diligence.  Since the record supports no plausible inference of due diligence (without regard to ISG's level of sophistication), these arguments need not be reached.

19