# United States Court of Appeals
## For the First Circuit

No. 24-1942

BLUERADIOS, INC., a Colorado corporation,

Plaintiff, Appellant,

v.

HAMILTON, BROOK, SMITH & REYNOLDS, P.C., a Massachusetts
professional corporation; DAVID J. THIBODEAU, JR., an
individual; LAWRENCE P. COGSWELL, III, an individual; GERALD
KAZANJIAN, an individual; STEPHEN D. BROOK, as Personal
Representative of the Estate of David E. Brook; JOSHUA MATLOFF,
an individual; and NELSON SCOTT PIERCE, an individual,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Gelpí, Thompson, and Montecalvo,
Circuit Judges.

J. Carl Cecere, with whom Cecere PC, David B. Seserman,
Seserman Law LLC, Douglas W. Salvesen, Sanford F. Rems, and Yurko
Partners, P.C. were on brief, for appellants.

Carolyn J. Fairless, with whom David J. Schaller, Frederick
R. Yarger, William D. Hauptman, and Wheeler Trigg O'Donnell LLP
were on brief, for appellees.

Alan Mygatt-Tauber and Paladin Law Office PLLC on brief for
Professor W. Keith Robinson, amicus curiae.

Timothy Cornell and Cornell Dolan PC on brief for US Inventor, LLC, amicus curiae.

_____

February 2, 2026

_____

THOMPSON, **Circuit Judge**.  To join the oldest bar in the country -- one older than our Nation itself -- an aspiring attorney for the Commonwealth of Massachusetts must swear to "delay no man for lucre or malice" and to conduct themself "with all good fidelity as well to the courts as" they conduct towards their "clients."[1]  The assumption undergirding that sacred oath is that lawyers are, in fact, faithful to their clients.

Today's case puts that assumption to the test.  A tech company called BlueRadios, Inc. (our appellant) brought a legal malpractice suit against the Massachusetts law firm Hamilton, Brook, Smith & Reynolds, P.C., and several of its attorneys (collectively, "HBSR") (our appellees).  In BlueRadios' view, HBSR is a two-timing firm that helped another company cheat BlueRadios out of patents -- while also representing BlueRadios.  But below, BlueRadios' quest for justice stopped at summary judgment.  The district court ended the litigation in HBSR's favor because, as a matter of law: (1) BlueRadios' claims were untimely, (2) no equitable tolling doctrine saved them, and (3) anyway, there was no attorney-client relationship between it and HBSR.

Yet we see things differently on a couple of fronts, so we reverse in part, vacate in part, and remand for more proceedings consistent with this opinion.  Read on to see why.

---

[1] Mass. Gen. Laws c. 221, § 38.

**HOW WE GOT HERE**

This case arises from a long-running intellectual property (or "IP") dispute between two tech companies: BlueRadios and Kopin Corporation (the "another company" from our intro).

**A**

The saga began in 2006.[2] That year, BlueRadios (a Colorado-based company that focuses on wireless technology like Bluetooth) and Kopin (a "micro-display" technology company) started collaborating to develop a unique wireless headset called "Golden-i" that would combine their specialties.

The next year, the two entered a contract detailing their rights and obligations for the Golden-i project. For our purposes, three provisions of the contract are important:

- BlueRadios and Kopin would jointly own any IP that BlueRadios developed for the Golden-i project;

- Kopin had the sole right to use BlueRadios' preexisting IP for the Golden-i project; and

- Kopin had the sole right and responsibility to decide whether and how to file patent protections for any IP

---

[2] We siphon our facts from the thick appellate record that the parties provided, consisting of 17 volumes and more than 9,000 pages. Within that record, we most often draw from the parties' statements of undisputed facts filed to the district court, but where necessary, we pull directly from evidentiary source material -- a contract, patent applications, emails, deposition transcripts, and the like.

developed during the Golden-i project. Efforts to do so would be at its expense.

Other provisions of the contract (whose details are largely immaterial to this appeal) include payment structures and royalty plans.

**B**

Kopin soon exercised its right and responsibility to prosecute Golden-i patents.[3] It chose HBSR to handle the patent

---

[3] Throughout today's opinion we'll use the phrase "patent prosecution" as well as variants like the above. For those new to patent law, we'll note that patent prosecution has nothing to do with criminal litigation, despite the overlapping use of "prosecution." Here's a recent, brief, and enlightening description of the patent prosecution process from one of our district courts:

> A person may apply and be entitled to a patent for an invention that is novel and non-obvious to a person having ordinary skill in the art. See 35 U.S.C. §§ 102-103. To apply for a patent, an applicant must submit a specification and claims to the United States Patent and Trademark Office ["USPTO" or "PTO"] in a process known as patent prosecution.
>
> Patent prosecution is an ex parte process completed without the participation of third parties. Without an adversary to challenge the applicant during patent prosecution, the applicant must abide by a duty of "candor, good faith, and honesty." . . . He must disclose to the PTO "all information known to [him] to be material to patentability." 37 C.F.R. § 1.56(a). Once the PTO decides that the invention satisfies the statutory requirements, a patent is issued that grants the owner the exclusive right to "make, use,

- 5 -

applications for the project, because Kopin and HBSR had a longstanding relationship dating back to the 1990s.[4] (That isn't the only connection; another more questionable one will come out later.)

About two weeks after BlueRadios and Kopin signed their contract, Kopin introduced BlueRadios to HBSR. Though HBSR did not enter an engagement agreement with BlueRadios (nor, notably, with Kopin), they soon began working together on Golden-i patents.

The parties have different views of what happened next. In BlueRadios' view, a close-knit attorney-client relationship quickly formed. After all, HBSR attorneys read the BlueRadios-Kopin contract before working with BlueRadios, so they knew the IP in the Golden-i patents belonged to both parties jointly. Likewise, HBSR opened a billing file specifically for BlueRadios matters, and BlueRadios employees gave powers of attorney to HBSR so it could prosecute patents on BlueRadios' behalf. BlueRadios

---

offer to sell, or sell" the invention for a period of time. 35 U.S.C. § 271(a).

United States ex rel. Sorgi v. Jazz Pharms. PLC, No. 21-cv-10891-PBS, 2025 WL 2701928, at *1 (D. Mass. Sept. 23, 2025) (cleaned up).

[4] HBSR is a two-office Massachusetts-based law firm that (on its website) describes itself as a "full-service intellectual property law firm" with "100% work that is IP related." Hamilton, Brook, Smith & Reynolds, https://www.hbsr.com/, [https://perma.cc/WJV9-GAGD] (last visited Jan. 2, 2026) (cleaned up).

disclosed important trade secrets to HBSR to facilitate the Golden-i patent prosecution process. BlueRadios sometimes communicated with HBSR without Kopin present. Finally, as they worked together, HBSR did not indicate to BlueRadios that it only represented Kopin or (put differently) that BlueRadios was not its client.

But in HBSR's view, it only represented Kopin the whole time, based on a few key facts. Among them: Kopin introduced HBSR to BlueRadios as solely Kopin's IP attorneys, and emails between BlueRadios and Kopin use that specific language throughout much of the prosecution process. Jeffrey Jacobsen, a Kopin employee who served as the Golden-i project manager, often acted as the middleman between BlueRadios and HBSR. Any confidential information that BlueRadios shared with HBSR was also shared with Kopin. BlueRadios did not have a direct engagement letter or a fee arrangement with HBSR, nor did it pay HBSR directly for any legal services.[5] Finally, BlueRadios admits (as HBSR highlights) that it "did not make individual requests for HBSR to perform discreet [sic] tasks in fulfilment of its role."

---

[5] We remind the reader here that the BlueRadios-Kopin contract established that patent protection efforts would be done "at Kopin's expense," and the parties don't flag whether there were (or weren't) any payments from BlueRadios to Kopin for HBSR's services, notwithstanding the billing file for BlueRadios.

C

Setting those differences aside, everyone agrees that between January 2008 and January 2009, HBSR filed several Golden-i patent applications. Its behavior in that patent application process is largely what gave rise to this suit. But rather than walk through the piles of paperwork and emails related to each application dispute right now, we'll provide a broad-strokes look at what happened. (We provide specifics later as necessary.)

BlueRadios' lamentations about HBSR's conduct fall into three buckets. First, HBSR altered some patent applications to the benefit of Kopin and the detriment of BlueRadios. Example: HBSR originally listed Wilfred Tucker and John Sample (two BlueRadios employees) on the '462 Application[6] and the identical '147 PCT Application.[7] It also sought a declaration from Tucker stating his inventorship rights on those applications. (Importantly, BlueRadios ultimately possessed those inventorship rights, because its employees assigned their rights to the

---

[6] Just a word on the patents' names: the parties refer to the patent applications primarily by the last three digits of the application number, so we do the same.

[7] "PCT" applications are those filed with the World Intellectual Property Organization (rather than the USPTO) under the "Patent Cooperation Treaty" (hence, "PCT"), and they preserve an applicant's ability to pursue patents internationally. See World Intellectual Property Organization, PCT -- The International Patent System, https://www.wipo.int/pct/en/ [https://perma.cc/2YLP-4JHD] (last visited Jan. 6, 2026).

company.)  But then, the firm amended the '462 Application to excise any reference to BlueRadios and its employees.  (More on what happened to the '147 PCT Application momentarily.)  A similar chain of events took place for the '646 Application, where Kopin was ultimately listed on the application as the sole "assignee," even though BlueRadios inventors had, in previous renditions, been listed (and had assigned their rights to BlueRadios).

Second, HBSR entirely abandoned at least one patent application that stood to benefit BlueRadios, without even telling BlueRadios.

And third, HBSR filed a "terminal disclaimer"[8] in at least one other application, again without telling BlueRadios. More specifically, BlueRadios' gripe is this: HBSR and Kopin filed another patent application with Golden-i-adjacent technology, but it was rejected for similarity to a pending patent application

---

[8] A "terminal disclaimer" is another patent-specific term. It's a mechanism that allows an applicant to disclaim (or give up) a patent or an application in full or in part.  See 37 C.F.R. § 1.321(b)-(c).  Importantly, terminal disclaimers are "a way for an applicant to overcome a double-patenting rejection."  Purdue Pharma L.P. v. Collegium Pharm., Inc., 335 F. Supp. 3d. 149, 156 n.3 (D. Mass. 2018) (cleaned up).  And since the term "double-patenting rejection" isn't obvious either, we'll explain more: a double-patenting rejection is an outcome in the patent application process; it "precludes one person from obtaining more than one valid patent for either (a) the same invention, or (b) an obvious modification of the same invention."  Boehringer Ingelheim Int'l GmbH v. Barr Lab'ys, Inc., 592 F.3d 1340, 1346 (Fed. Cir. 2010) (cleaned up).  So with that all in mind, read on to see how HBSR and Kopin purportedly overcame a double-patenting rejection using a terminal disclaimer to BlueRadios' detriment.

that BlueRadios was on (and thus would benefit from). So, to remove the obstacle that was the already-filed patent application, HBSR filed a terminal disclaimer that limited the scope of the already-filed application. The point? That disclaimer essentially ended a pending BlueRadios-Kopin joint application by claiming that Kopin had a 100 percent interest in the patents -- a statement that BlueRadios now disputes. And HBSR did so without telling BlueRadios and years after BlueRadios and HBSR stopped speaking (more on that shortly).

HBSR says that BlueRadios knew of all these shenanigans the whole time, in large part because its employees received copies of some of the amended applications it now complains about. (As the reader will soon see, the district court agreed.) As HBSR tells it, the BlueRadios team then either simply failed to act entirely, or in one case, actually internally flagged the issue but still failed to do something more. And HBSR also notes that the patent applications and their file histories were publicly available for anyone to view on the website of the United States Patent and Trademark Office ("USPTO"), so nothing was hidden. Everything was thus sufficiently above-board and BlueRadios should have known about its purported harms -- or so HBSR says.

**D**

In the summer of 2009, BlueRadios and Kopin had a falling out. (The parties skirt around what happened, but it seems

- 10 -

unrelated to their IP spat.)  So they stopped communicating and jointly working on Golden-i in July 2009.  BlueRadios' last direct communication with HBSR was one month earlier, on June 16, 2009, and they too stopped communicating after the BlueRadios-Kopin split.  And for years, nothing more seemed to come of the breakup -- at least that BlueRadios was aware of.[9]

But some of the underhandedness that we described above actually took place after the parties went radio silent.  For instance, the above-mentioned abandonment of the '147 PCT Application didn't happen until 2011, and much of the chicanery with the '646 Application, including the removal of BlueRadios' people, didn't come to fruition until a year after that (and thus three years from when the parties were last in touch).  And while the appellate record contains internal documents of Kopin and HBSR stating that they "need to tell" BlueRadios about abandoning one application and that another change "may require" BlueRadios' approval, we see nothing in the record suggesting that someone actually let BlueRadios know about any of it.  So BlueRadios carried on, none the wiser.

---

[9] Still, BlueRadios says the BlueRadios-Kopin contract never officially terminated.  And it claims that, since the start of the Golden-i project, HBSR has obtained more than forty patents for Kopin that contained BlueRadios' technology but did not give credit to BlueRadios' contributions.

**E**

Fast forward to August 2014, about five years after the breakup. That month, BlueRadios began assessing its patent portfolio after Google approached it about a possible acquisition. Mark Kramer, BlueRadios' President and CEO, reached out to Kopin's Jeffrey Jacobsen (reminder: the project manager middleman) to ask about the value of the Golden-i patents. Jacobsen directed Kramer to another member of the Kopin team, who never responded to Kramer's inquiries.

Here's where things get tricky (if the reader didn't think they were already). Kramer then started to conduct his own research but could not find the Golden-i patents that Kopin and HBSR had claimed to put BlueRadios on. Here are Kramer's exact words describing the situation:

> One of the clients wanted to know what [sic] our patent portfolio. We were searching and we couldn't find our names on patents that we were claimed to be put on from Kopin and our patent attorney HBSR.
>
> So we had our -- at the time we had a patent person in New Jersey doing some IOT stuff. I said, hey, I can't search in the USPTO. I'm not that efficient. Can you go find the history of what happened to these patents?

So, as the above suggests, Kramer instructed BlueRadios' patent attorney, James Klobucar (outside counsel hired in 2011 to handle contract patent work for it), to look into the patents. The parties dispute Kramer's motivation for involving Klobucar (the

- 12 -

relevance of which will soon become clear): HBSR chalks it up to Kramer's suspicion of something awry (leaning into "we couldn't find our names on the patents"), while BlueRadios says it was Kramer's unsurprising deficiencies as a layperson navigating the complex world of patent law (leaning into "I can't search in the USPTO" and "I'm not that efficient").

And the parties also dispute what, exactly, the purpose of Klobucar's assignment was. We do have the email from Kramer to Klobucar. It's a longer email providing plenty of background (yet making no mention of HBSR), but here's the exact instruction:

> You will want to search for patents filled [sic] under either: John Sample, Wilfred Tucker, Mark Kramer, Christopher Parkinson, or Jeffrey Jacobsen at Kopin.
>
> Please record your time under the Golden-i project so we can have an accurate record of time spent on this case.

Klobucar did just that. He compiled information that fit the criteria, and on November 26, 2014, created a list of one patent and several patent applications.[10] Patent applications on

---

[10] Typically, we try not to pepper the reader with exact days, because we agree with the sentiment that "few things are duller than a paragraph stuffed with dates." Ross Guberman, Once Upon a Time: Replace Dates with Phrases that Convey a Sense of Time, BriefCatch: Blog (Mar. 31, 2023) https://www.briefcatch.com/blog/once-upon-a-time-replace-dates-with-phrases-that-convey-a-sense-of-time [https://perma.cc/3DXW-A8YH] (last visited Jan. 6, 2026). But because this appeal is mainly about a statute of limitations issue, there will be times where we must do just that, so we ask the reader's patience as we focus on exact dates more than normal.

Klobucar's list are at least some of the same ones that BlueRadios is now suing HBSR over. Klobucar sent BlueRadios invoices dated December 3, reflecting his fees for the November searches. Sometime later, BlueRadios paid the fees. And Klobucar shared the list he compiled with BlueRadios in "mid-December" 2014, but, notably, not earlier.

The next year, Klobucar sent two letters to HBSR describing inaccuracies he had unearthed in Golden-i patents and applications. HBSR first responded that Kopin "believes that the correct inventors have been named for each of the pending patent applications and issued patents at issue," and when pressed further by Klobucar in a second letter, remained of that view.

**F**

BlueRadios disagreed, so it sued Kopin in the U.S. District Court for the District of Colorado for breach of contract, among other claims. (This is the first of two lawsuits relevant to our appeal.)

In that case, HBSR entered as Kopin's counsel, but BlueRadios quickly moved to disqualify the firm (a motion that Kopin and HBSR opposed). See BlueRadios, Inc. v. Kopin Corp., No. 16-cv-2052-JLK, 2017 WL 11546716, at *1 (D. Colo. Jan. 24, 2017). The Colorado district court granted the motion over Kopin and HBSR's objections. Id. at *4. It decided that BlueRadios and HBSR had an attorney-client relationship during the relevant

period, so HBSR's representation of Kopin against BlueRadios during the litigation would be inappropriate. Id. at *2-4.

For a little while after that, the case proceeded in the normal course. But then, BlueRadios says that through the discovery process, it learned about HBSR's malfeasance (as distinct from Kopin's) in 2017. It apparently became clear after seeing internal communications between HBSR and Kopin (like the notes we described above) that showed how HBSR had schemed to deny BlueRadios' ownership interests and not even tell it, all to Kopin's benefit.

HBSR's motive for the deceit? At least in BlueRadios' view: attorney David Brook (the "B" in "HBSR") was at all relevant times (and, as far as we can tell, unbeknownst to BlueRadios until the Colorado litigation) also a Kopin co-founder and the secretary of Kopin's Board of Directors. He was also the owner of a multimillion-dollar stock position in Kopin -- a position that he apparently liquidated almost entirely right before BlueRadios sued HBSR.[11] So (says BlueRadios) HBSR had a financial incentive to help Kopin profit at BlueRadios' expense.

---

[11] We say "apparently" because BlueRadios only offers the complaint as support for Brook liquidating his stock at that most convenient time. And while the complaint says that's supported by SEC filings, BlueRadios doesn't point us to them, and we aren't going to do the parties' work of looking for them.

- 15 -

And those discoveries in the Colorado litigation led to a pivotal momentary truce between HBSR and BlueRadios. They entered a "tolling agreement" that preserved any claims that were timely as of December 5, 2017.[12]

Following a jury trial in Colorado, BlueRadios secured a multimillion-dollar verdict against Kopin for its conduct.[13] Appeals in that case are (as far as we can tell) still pending in the Federal Circuit.

### G

But recall above that we said "lawsuits," plural. The case now before us began in March 2021, when BlueRadios sued HBSR in Massachusetts' federal district court. BlueRadios brought a set of claims -- the headliners being legal malpractice, breach of fiduciary duty, and fraudulent concealment. Litigation proceeded in the normal course: a partially successful motion to dismiss that winnowed out a "civil conspiracy" claim against all the defendants (as well as two other counts against defendant Joshua Matloff, an HBSR attorney), an amended complaint, an answer, and so on.

---

[12] More simply, the agreement stopped the statute of limitations clock from running. That's why, as we'll soon explain, under a three-year limitations period, the claims must not have accrued before December 5, 2014.

[13] See BlueRadios, Inc. v. Kopin Corp., No. 1:16-cv-02052-JLK, 2025 WL 2886547, at *27-28 (D. Colo. Sept. 4, 2025), appeal docketed, No. 26-1067 (Fed. Cir. Oct. 17, 2025).

- 16 -

Following discovery, the parties each moved for summary judgment. BlueRadios sought partial summary judgment about whether an attorney-client relationship existed between HBSR and BlueRadios (as well as another issue not material to today's appeal). HBSR, meanwhile, moved for summary judgment on all remaining claims.

The district court granted summary judgment for HBSR and denied it for BlueRadios. That order is what's on appeal, so we'll walk through it in detail. The district court held first that the statute of limitations barred all of BlueRadios' claims. It began with the premise that in Massachusetts (whose law indisputably applied to this action under diversity jurisdiction), a three-year statute of limitations governed the relevant claims.[14] So, for BlueRadios' claims against HBSR to be timely, they must not have accrued before December 5, 2014 -- three years to the day before the tolling agreement.[15] After walking through the contested patent applications, the district court held that BlueRadios was

---

[14] Except, possibly, for the claim BlueRadios brought under Massachusetts General Law Chapter 93A, forbidding unfair or deceptive business conduct. The district court recognized how that claim might be governed by a four-year statute of limitations, but reasoned that, even under the four-year period, the claim was untimely.

[15] Caselaw referencing a claim's "accrual" or a claim having "accrued" is a technical way of saying that the limitations clock has started to run. Once a claim has "accrued," the plaintiff must bring the claim within the requisite period for filing suit or it's deemed untimely.

on "constructive notice" of its claims as early as 2008 and on actual notice by November 2014 at the latest. Either way, its claims ripened before the deadline and were thus untimely.

Nor, in the district court's view, did any equitable tolling doctrines save the claims. The "continuing representation" doctrine[16] did not apply for three reasons: because BlueRadios and HBSR did not have not an attorney-client relationship, because BlueRadios purportedly "expressed misgivings" about HBSR's actions as early as 2008, and because communications between BlueRadios and HBSR stopped in 2009.[17] And the "fraudulent concealment" doctrine[18] did not preserve the claims

---

[16] In Massachusetts, the continuing representation doctrine "tolls the statute of limitations in legal malpractice actions where the attorney in question continues to represent the plaintiff's interests in the matter in question," because it isn't "realistic to say that the client's right of action accrued before he terminated the relationship with the attorney." Murphy v. Smith, 579 N.E.2d 165, 167-68 (Mass. 1991) (cleaned up).

[17] The "expressed misgivings" point is especially important, so we'll explain a bit more here (and unpack it fully later). Recall that we noted BlueRadios had internally flagged inconsistencies as to one application; to be specific, Kramer said in an email that it was "sort of reckless" for BlueRadios not to be on the patent application. Relying on that episode, the district court turned to Massachusetts caselaw about questioning the attorney's competence and, applying it here, held that the continuing representation doctrine is rendered a nullity once the plaintiff "had questioned and had assessed [the attorney's] representation of his interest and found it to be wanting," even if the attorney hadn't yet been fired. Cantu v. St. Paul Cos., 514 N.E.2d 666, 669 (Mass. 1987).

[18] In Massachusetts, the statute of limitations for cases is tolled when "a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person

because the patent applications were publicly available and because HBSR did not owe BlueRadios a "duty of disclosure" related to the patent omissions and amendments.

The statute of limitations holding would have been enough to end the case. But "for completeness," the district court also held that some of BlueRadios' claims failed for another more fundamental reason: there was no attorney-client relationship between BlueRadios and HBSR. BlueRadios failed to satisfy even the first of three elements for the Massachusetts attorney-client relationship test, because (in the district court's view) it did not seek "advice or assistance" from HBSR directly.

BlueRadios timely appealed the district court's order granting summary judgment, and here we are.[19]

## STANDARD OF REVIEW

"We review an order granting summary judgment de novo." Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). The standard is a familiar one: a court can grant summary judgment "only if the record, construed in the light most amiable to the

---

entitled to bring it." Mass. Gen. Laws c. 260 § 12; see also Demoulas v. Demoulas Super Markets, Inc., 677 N.E.2d 159, 174 (Mass. 1997).

[19] We'll note here that two amicus curiae, IP Professor W. Keith Robinson and a nonprofit organization called US Inventor, each filed briefs supporting BlueRadios. We thank them for their helpful offerings.

- 19 -

nonmovant, presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law." Id. (cleaned up); see Fed. R. Civ. P. 56(a).

**OUR TAKE**

We now turn to BlueRadios' arguments. We'll start with the statute of limitations issue, then turn to the attorney-client relationship question, and conclude with some brief thoughts on equitable tolling. (The reader will soon see why we decide to take the issues in that order.)

**A. Statute of Limitations**

Recall the district court's primary holding: BlueRadios' claims against HBSR were untimely under a three-year statute of limitations.[20] It explained that BlueRadios alleges that HBSR "engaged in misconduct by depriving BlueRadios of inventorship, ownership and assignment rights in several patents." So the district court reasoned (as we explained above but think worth reiterating) that BlueRadios was on "constructive notice" of HBSR's actions during the 2008-09 period and actual notice by November 2014, when Klobucar began conducting searches into the Golden-i patent portfolio.

---

[20] We remind the reader that the district court separately noted that, even if a four-year limit applied to the Chapter 93A claim, it would have still been untimely.

On appeal, BlueRadios says otherwise. First, it says it did not discover the facts necessary to trigger accrual until 2017, when, during the Colorado litigation, it uncovered evidence of the scheme between Kopin and HBSR. The other prior instances identified by the district court all fail to trigger the limitations period (at least in BlueRadios' view). That's the case because: (1) as a matter of law, misstating inventorship in a patent application cannot constitute the appreciable harm necessary for accrual, and (2) as a matter of fact, nothing that BlueRadios learned in 2008-09 or in November 2014 gave sufficient notice of harm for the statute of limitations to start running.

In response, HBSR explains that BlueRadios must run the table to overcome the district court's three-pronged reasoning on the statute of limitations issue. Contends HBSR:

- First, BlueRadios knew enough to trigger the statute of limitations in four instances between 2008 and 2009.

- Second, BlueRadios also should have known (rather than "knew") sufficient facts about its alleged harms beginning in 2009 because, by then, the disputed applications were publicly available on the USPTO website.

- Third, BlueRadios knew enough facts to trigger notice in November 2014, once it had Klobucar start investigating the patents.

And HBSR says we would have to find that the district court erred on all three holdings to revive BlueRadios' claims. Put differently, if the district court was right about any of those three holdings, BlueRadios' claims must be untimely.

As the reader can see, there are a few moving parts here. So, before we dive into the record, we'll provide a brief primer on the discovery rule, the mechanism that governs the timeliness of a legal malpractice claim. After that, we'll take a fresh look at the record and offer our thoughts on whether the claims were untimely. (Spoiler: in strict adherence to Massachusetts caselaw, we think it's a jury question all the way down.)

**i**

In Massachusetts,[21] the statute of limitations for a legal malpractice claim starts to run when a client "knows or reasonably should know that he or she has sustained appreciable harm as a result of the lawyer's conduct." Williams v. Ely, 668 N.E.2d 799, 804 (Mass. 1996). Colloquially, the "discovery rule."

---

[21] As we noted, the district court applied Massachusetts law because the case arose through diversity jurisdiction. No one contests the applicability of Massachusetts law on appeal, so (without getting into potentially sticky choice-of-law issues) we see no reason to use any other jurisdiction's law. See, e.g., Daigle v. Me. Med. Ctr., Inc., 14 F.3d 684, 689 (1st Cir. 1994) ("A federal court sitting in diversity jurisdiction and called upon in that role to apply state law is absolutely bound by a current interpretation of that law formulated by the state's highest tribunal.").

Under the discovery rule, we assess knowledge from the vantage of "a reasonable person in the plaintiff's position." Taygeta Corp. v. Varian Assocs., Inc., 763 N.E.2d 1053, 1063 (Mass. 2002) (cleaned up). The plaintiff "need not know the extent of the injury or know that the defendant was negligent for the cause of action to accrue." Williams, 668 N.E.2d at 804. But they must have sufficient information to recognize that they have an injury that is "causally connected to" the defendant's conduct for the clock to start. Int'l Mobile Corp. v. Curron & Black/Fairfield & Ellis, Inc., 560 N.E.2d 122, 124 (Mass. App. Ct. 1990). And appreciable harm "includes injury, loss or detriment that is capable of being measured or perceived." Frankston v. Denniston, 907 N.E.2d 244, 251 (Mass. App. Ct. 2009) (cleaned up). Sometimes, it can include "additional legal fees to ameliorate the harm caused by" the attorney's malpractice. Levin v. Berley, 728 F.2d 551, 554 (1st Cir. 1984). (More on this line of cases later.)

One more important point. In Massachusetts, whether "a plaintiff knew or should have known is a question of fact that is often unsuited for summary judgment." Khatchatourian v. Encompass Ins. of Mass., 935 N.E.2d 777, 780 (Mass. App. Ct. 2010) (cleaned up). Indeed, the Supreme Judicial Court of Massachusetts (or "S.J.C.") has said that "in most instances, the question [of] when a plaintiff knew or should have known of its cause of action is one of fact that will be decided by the trier of fact." Taygeta

<u>Corp.</u>, 763 N.E.2d at 1063 (cleaned up).  Only when facts about discovery "are undisputed, the question may be decided as [a] matter of law."  <u>Khatchatourian</u>, 935 N.E.2d at 781 (cleaned up).

**ii**

The district court first decided that BlueRadios was on "constructive notice" of its claims as early as 2008 and 2009 because it "had knowledge of the issues of which [it] has complained of concerning inventorship and assignment rights as early as" then.[22]  We aren't convinced for a few reasons.

---

[22] While not as substantive as the discussion that follows, we note here that BlueRadios rightly took aim at the district court's occasional use of the term "constructive notice" to describe its analysis under the discovery rule.  We don't think the district court's concept of "constructive notice" (which the court seemed to think was established primarily via mere receipt of copies of the patent applications) accurately reflects Massachusetts discovery rule caselaw.  The relevant inquiry is (as the district court elsewhere noted) whether the plaintiff "knows or reasonably should know that he or she has been harmed by the defendant's conduct."  <u>Williams</u>, 668 N.E.2d at 804.

In Massachusetts, "constructive notice" carries specific legal import -- it's notice "arising by presumption of law from the existence of facts and circumstances that a party had a duty to take notice of, such as a registered deed or a pending lawsuit; notice presumed by law to have been acquired by a person and thus imputed to that person."  <u>Bank of Am., N.A.</u> v. <u>Casey</u>, 52 N.E.3d 1030, 1041 n.21 (Mass. 2016) (quoting <u>Black's Law Dictionary</u> 1227 (10th ed. 2014)).  With that in mind, we see constructive notice as a distinct legal concept probably irrelevant to the necessary discovery rule analysis here.  Perhaps the district court was using "constructive notice" as shorthand for "reasonably should know," and that would be the right inquiry.  <u>See, e.g.</u>, <u>Williams</u>, 668 N.E.2d at 804.  But we don't see any caselaw equating the two, nor do the parties point us towards any, so we include this footnote to clarify the right terms that guide the analysis.

For one, much of the district court's reasoning turned on BlueRadios' receipt of copies of applications updated with the allegedly sinister (but surreptitious) changes. We take the district court's point to be that, because HBSR sent BlueRadios copies of the patent applications at issue throughout this period, BlueRadios should have known of HBSR's skullduggery. But we think it reasonably doubtful that the district court's holding -- that, as a matter of law, mere receipt of highly technical patent applications triggered notice for these non-lawyers -- could be correct.

Remember that we're at summary judgment, so we must assess the record "in the light most favorable to the non-movant" (BlueRadios) and draw "all reasonable inferences in [its] favor," affirming "only if the record reveals no genuine dispute as to any material fact and the movant" (HBSR) "is entitled to judgment as a matter of law." Taite v. Bridgewater State Univ. Bd. of Trustees, 999 F.3d 86, 92-93 (1st Cir. 2021).

And reading the record in the light most favorable to BlueRadios, we think reasonable people could disagree about whether its non-lawyer employees should have appreciated what was happening. After all, the issues that the district court thought BlueRadios should have spotted largely concerned assignment, a somewhat complex property/contracts concept, and inventorship, long said to be "one of the muddiest concepts in the muddy

- 25 -

metaphysics of the patent law." <u>Mueller Brass Co.</u> v. <u>Reading Indus., Inc.</u>, 352 F. Supp. 1357, 1372 (E.D. Pa. 1972). On this point, we find BlueRadios' description of itself (taken from its brief, but well-supported in the record) highly relevant:

> As a small, 3-person company owned exclusively by engineers with almost no knowledge of the patent prosecution process that had never attempted to patent anything, BlueRadios employees did not know what a patent claim was, how inventorship was determined, what the designation of an "assignee" on a patent actually meant, or why it would be necessary to list it on a patent application.

We can see how a jury could reasonably reach the same conclusion, so summary judgment against BlueRadios on the grounds that it knew or should have known about HBSR's misconduct in 2008-09 was error. See <u>Cambridge Plating Co.</u> v. <u>Napco, Inc.</u>, 991 F.2d 21, 30 (1st Cir. 1993) ("We think it within a factfinder's province to conclude that, in late 1985, Cambridge Plating had no basis for suspecting Napco's workmanship and reasonably attributed the system's problems solely to its own deficient operation. If so, the statute of limitations would not yet have begun to run.").

Holding in the alternative -- that receipt alone of highly technical and legally complex documents by non-lawyers triggers accrual as a matter of law -- would be troublesome. We think that outcome would require clients (who believe an attorney is representing their legal interests) to somehow double-check their attorney's work (or hire a second attorney) any time they

receive a document just to preserve a malpractice claim based on that document; it would thus infuse skepticism into a relationship that is best built on trust. As we've explained, "the attorney . . . is an expert, and much of his work is done out of the client's view." Rosen Constr. Ventures, Inc. v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 364 F.3d 399, 410 (1st Cir. 2004) (cleaned up). But, meanwhile, "the client is not an expert; he cannot be expected to recognize professional negligence if he sees it, and he should not be expected to watch over the professional or to retain a second professional to do so." Id. (cleaned up); see also Eck v. Kellem, 748 N.E.2d 1047, 1051 (Mass. App. Ct. 2001) (explaining that the plaintiff had the right to "repose confidence in the professional ability and good faith" of their attorney (cleaned up)). That result is better avoided.

Mere receipt was the throughline of the district court's reasoning, but not the only reason it thought BlueRadios was on "constructive notice" of its claims as early as 2008. The district court also made another holding that we'll detail momentarily as to one specific application, but that holding doesn't move us from our conviction that this overarching issue, as the S.J.C has stated, is better suited for a jury. See Taygeta Corp., 763 N.E.2d at 1063.

As to the '090 Application specifically, the district court held that BlueRadios was on notice of its harms additionally

- 27 -

because Kramer (BlueRadios' CEO) had made an "expression of misgiving" to Tucker (another BlueRadios employee) and that his expression of misgiving was "compelling proof that the plaintiff was on notice" (the district court's words). In reaching that conclusion, the district court cited two cases: RTR Technologies, Inc. v. Helming, 815 F. Supp. 2d 411, 421 (D. Mass. 2011), and Lyons v. Nutt, 763 N.E.2d 1065, 1069 (Mass. 2002).

But we don't think Kramer's one email to Tucker reaches the same level of "misgiving" as those cases the district court cited. RTR Technologies concerned a client who "repeatedly and openly expressed" her concern about her lawyers "to various individuals" and was "actively investigating the disputed issue several years before filing suit." 815 F. Supp. 2d at 421-22.

Lyons, meanwhile, is a bit more complicated. It involved a trustee who instructed his attorneys "to take whatever action was necessary to accept [an outstanding] offer to purchase" a company in the possession of the trust he oversaw. 763 N.E.2d at 1067. Yet the trustee's lawyers didn't act for months, the offer was withdrawn, and the trustee became subject to suit by the beneficiaries of the trust as a result. Id. at 1067-68. Once the offerors walked away, the trustee realized that his attorneys "didn't know what they were doing" (as he later stated in a deposition). Id. at 1069. The S.J.C. affirmed that the statute of limitations for the trustee's malpractice claim against his

lawyers began to run at that moment of realization, because right then, he knew "that he sustained appreciable harm as a result of the lawyer's conduct." Id. at 1070 (cleaned up). For statute of limitations purposes (as well as for purposes of the continuing representation doctrine, which we'll turn to later), it was no matter that the trustee continued to work with those lawyers after the failed purchase, because he had already expressed a total repudiation of confidence in their abilities. Id. at 1070-71.

By contrast, Kramer only once said to another one of his colleagues that it was "sort of reckless" to add Parkinson (a Kopin employee) to a patent but not name anyone from BlueRadios. And his statement that the "Patent Attorneys need to be aware of this" (made in the same email) can fairly imply that he thought HBSR wasn't in the know about the omission -- a point in BlueRadios' favor. See Williams, 668 N.E.2d at 804 (explaining that the client must know that he "sustained appreciable harm as a result of the lawyer's conduct" (emphasis ours)). To boot, Tucker (the employee to whom Kramer made the comment) later raised the issue to Jacobsen (the Kopin middleman), who then forwarded the email to HBSR and blind-copied Tucker. We think a factfinder could reasonably conclude, as BlueRadios puts it, that "Tucker believed that HBSR would use the information appropriately and did not believe there was any more he could do to address the issues he raised." So we

- 29 -

don't share the district court's certainty that the "misgivings" line of cases controls here.

And to the extent that HBSR thinks this one kerfuffle about one application could be a death-knell for the whole case, our precedent forbids that outcome. See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 241 (1st Cir. 2005). Like that panel, we "do not believe that in a complex case of this nature -- where . . . secrets of varying importance are alleged to have been divulged over a period of years -- that notice of one misappropriation can constitute sufficient notice to begin tolling the statute for all misappropriations." Id.

And, anyway, "a wronged party should not be prejudiced with regards to later [acts] committed against it, simply because a defendant started the clock running by committing similar acts at an earlier time." Id. That language is especially pertinent here, because (as we've highlighted) some of HBSR's chicanery took place years after the patent applications were submitted and after the parties were out of touch (i.e., post-June 16, 2009).[23] A factfinder is better positioned to resolve this issue to the extent some harms -- like the abandonment of the '147 PCT Application in 2011 or the amendments to the '646 Application in 2012 -- were

_____

[23] Remember too that the BlueRadios-Kopin contract had not formally terminated at this point, so it was at least an open question whether their contractual obligations remained in place (as far as we can tell from the parties' filings).

- 30 -

years from happening and, by our lights, not discernable from the state of the papers in 2008-09.

Put differently, we don't think it's so clear-cut, as a matter of law, that BlueRadios could have anticipated from the receipt of paperwork in 2008-09 that HBSR would hang them out to dry in 2011-12. Although the district court acknowledged that such important facts happened later on, it did not, in our view, adequately reckon with how that influenced the analysis. Under our caselaw, that's a problem: while "statutes of limitations provide necessary closure and fairness for potential defendants," it's also clear that "no defendant should be able to immunize itself from later, potentially graver claims, by openly engaging in prior, similar offenses that the future plaintiff does not believe warrant bringing suit." Id. And given that we think reasonable people could disagree about whether HBSR was even "openly engaging" in the conduct that BlueRadios is suing it over, that concern is even more prevalent here. Id.

So we hold that whether BlueRadios knew or should have known about HBSR's purported sins back in the 2008-09 period is a question best left for the jury. See Cambridge Plating Co., 991 F.2d at 30; Mass. Eye & Ear, 412 F.3d at 241.

**iii**

The district court separately held that the applications' publication on the USPTO website in the 2008-09

- 31 -

period put BlueRadios on sufficient notice to get the clock running.  But we disagree on this point, too.

For starters, we read the cases that the district court cited a bit differently.  Wise v. Hubbard held that the harm (there, a conversion) "became knowable when the patent was issued and recorded," not just when the patent application was filed. 769 F.2d 1, 3 (1st Cir. 1985) (emphasis added).  There is, as amicus Professor Robinson makes clear, a notable difference between a patent application and an issued patent.[24]  See, e.g., Marsh v. Nichols, Shepherd & Co., 128 U.S. 605, 612 (1888) ("Until the patent is issued, there is no property right in it; that is, no such right as the inventor can enforce.").  So we don't think Wise mandated accrual back in 2008-09.

And the other case the district court relied on for this point is not to the contrary.  See Geo. Knight & Co. v. Watson Wyatt & Co., 170 F.3d 210 (1st Cir. 1999).  For one, it is factually different -- involving not an attorney-client relationship but the relationship between an actuarial firm and a company.  170 F.3d at

---

[24] We'll note that some of BlueRadios' and Kopin's patent applications were provisional patent applications.  As we understand it, provisional applications are "quick and inexpensive" filings that only serve "as a placeholder" with the USPTO and give the applicants "the benefit of priority" for an invention but don't, themselves, confer rights.  United States v. Camick, 796 F.3d 1206, 1218 (10th Cir. 2015) (cleaned up) (quoting U.S. Patent & Trademark Office, Manual of Patent Examining Procedure § 201.04 (9th ed. 2014) (hyperlink omitted)).

211-12. The firm identified a problem in the company's funding of its retirement contribution plans for its employees, and the firm then made several suggestions to remedy that problem. Id. The company adopted one of those proposals, but that proposal, years later, actually exposed the company to liability; the company then sued the actuarial firm for the harms suffered due to the poor proposal. Id. at 212. Yet we held that the company "had sufficient information -- indeed, all of the information -- it needed to know" about the liability at the time it first adopted the firm's plan. Id. at 214 (emphasis omitted).

But here, HBSR (as far as we can tell) never explicitly told BlueRadios of its omissions or amendments to the patent applications, despite later contemplating the need to do so. Yes, HBSR sometimes provided BlueRadios copies of applications with those omissions or amendments on them, but (again, as far as we can tell from the record), it did so without flagging the changes. Given the importance of the learned legal professional in this relationship, the difference matters. See Rosen Constr., 364 F.3d at 410 ("The client is not an expert; he cannot be expected to recognize professional negligence if he sees it, and he should not be expected to watch over the professional or to retain a second professional to do so." (cleaned up)). And the malpractice at issue in Geo. Knight required the expertise of the company's internal accountant -- which, importantly, it had -- to uncover.

170 F.3d at 215 (explaining how the problem "was brought to the attention of [the company] by its accountant"). By contrast, BlueRadios lacked an in-house patent attorney (to repeat, it believed HBSR was protecting its joint patent interest with Kopin). That's precisely why it was at the mercy of HBSR in the first place and why it took a second patent attorney (Klobucar) to start to figure things out <u>years later</u>. So we don't think <u>Geo. Knight</u> disfavors BlueRadios.

And as to the merits of the district court's holding -- that publication of patent applications on the USPTO website in 2009 meant that BlueRadios' non-lawyers "should have known" about the errors -- that question is one better left for the jury for the same reasons we've provided in the previous section. <u>See Cambridge Plating Co.</u>, 991 F.2d at 30; <u>Mass. Eye & Ear</u>, 412 F.3d at 241. In short, we see a difference between knowledge that BlueRadios could have attained (via the USPTO website) and knowledge it reasonably should have attained. HBSR wants to collapse the distinction, but a jury (not a judge) should decide whether that's appropriate in these circumstances. <u>See Taygeta Corp.</u>, 763 N.E.2d at 1063.

#### iv

Next, the district court held that BlueRadios was on notice of its claims in November 2014 at the latest. It reached

that conclusion for two big reasons, but in taking a fresh look at the record ourselves, neither persuades.

First, the district court explained how the fact "that BlueRadios conducted their own inquiry and then hired an attorney to look into the patent history because they were not finding their names on patents was sufficient to provide notice of harm and accrual of the statute of limitations." But Kramer's exact words describing the situation that led him to ask Klobucar read a bit differently to us. Again, here's what he said:

> One of the clients wanted to know what [sic] our patent portfolio. We were searching and we couldn't find our names on patents that we were claimed to be put on from Kopin and our patent attorney HBSR.
>
> So we had our -- at the time we had a patent person in New Jersey doing some IOT stuff. I said, hey, I can't search in the USPTO. I'm not that efficient. Can you go find the history of what happened to these patents?

Reading that passage in the light most favorable to BlueRadios (as we must), we don't think it was appropriate grounds for summary judgment. Here, as above, we think the district court didn't adhere to its important duties to examine the record "in the light most favorable to the non-movant" and to draw "all reasonable inferences in [its] favor." Taite, 999 F.3d at 92 (cleaned up).

More specifically, the district court cast aside the version of the events more amenable to BlueRadios -- that, as Kramer suggests with his remark that he wasn't "that efficient,"

he wasn't able to find the patents and applications on the USPTO website because he wasn't a patent attorney -- for a version that was not firmly rooted in the record -- that Kramer knew he wasn't finding names because of HBSR's underhandedness. Given (again) that "in most instances, the question [of] when a plaintiff knew or should have known of its cause of action is one of fact that will be decided by the trier of fact," we don't think this testimony (that could reasonably be interpreted at least two ways) is such a smoking gun that it takes the case out of the jury's hands. Taygeta Corp., 763 N.E.2d at 1063 (cleaned up); see also Rosen Constr., 364 F.3d at 410-11 (declining to hold that a claim accrued as a matter of law based on a note because "the language [the firm] cite[d] [wa]s ambiguous" as to whether the plaintiff had actual knowledge of the firm's alleged negligence).

Second, the district court held that BlueRadios knew of its injury around November 2014 because "of the facts that Klobucar discovered during the course of his patent search, including that Kopin was the sole assignee for certain patents, [that] BlueRadios was deleted as inventors on certain patents," and that HBSR was "prosecuting the patents." And nested within that holding, the district court offered two reasons why Klobucar's actions put BlueRadios on the hook.

It first pointed to the incurrence of legal fees before December 5, 2014, citing caselaw showing how that was a

sufficiently appreciable harm for purposes of accrual under the discovery rule. But the legal expenses incurred before December 5, 2014 weren't the type of "litigation-related expenses in defending against, or advancing, an issue that is central to the alleged legal malpractice" that would trigger accrual. Frankston, 907 N.E.2d at 251; see, e.g., Eck, 748 N.E.2d at 1050 (a case that "does not fall within that rule"). For one, Klobucar had been BlueRadios' contract attorney for patents since 2011, and a reasonable jury could (as we just discussed) find that BlueRadios asked him to look into the Golden-i patents for non-HBSR malpractice reasons (that is, to assess its patent inventory), so it's fair to say that BlueRadios "engaged another attorney" for "reasons unrelated to any dissatisfaction with [HBSR]." Rosen Constr., 364 F.3d at 407. And it wasn't yet clear that BlueRadios "was being represented by independent counsel who knew of the cause of action" that BlueRadios had, because prior to "mid-December 2014," Klobucar hadn't communicated his findings with anyone at BlueRadios who could have connected the dots. Levin, 728 F.2d at 554 (emphasis added). Under those circumstances, attorney's fees aren't an appreciable harm that would start the clock. Rosen Constr., 364 F.3d at 407.

One more point on this issue. Recall that even after Klobucar's inquiry letters to HBSR, HBSR stated that the "correct inventors have been named in each of the pending applications" and

- 37 -

that "changes would not be appropriate." In cases where past counsel gave no reason to think otherwise, both the First Circuit and a Massachusetts appellate court have found accrual at the first moment of new attorneys' fees inapt. See Rosen Constr., 364 F.3d at 407 ("[The law firm] continued to assure [the client] that it would prevail in its action against [a third-party] and that the Fill Agreement protected [the client's] rights. Furthermore, [the client] engaged another attorney . . . for reasons unrelated to any dissatisfaction with [the firm]."); Eck, 748 N.E.2d at 1051-52 (holding that the statute of limitations began to run from the time of judgment, not the first payment to the new attorney). We recognize that the assurances in those cases were clearer cut than what BlueRadios says was an assurance here, but we think the behavior was similar enough to warrant a cautious approach to accrual at the summary judgment stage.[25] See Taygeta Corp., 763 N.E.2d at 1064 ("Such a disputed issue of fact should be resolved by a jury.").

And that leads to the second reason the district court said that BlueRadios acquired sufficient knowledge based on Klobucar's search: the line of cases about how the "client is charged with the knowledge of his attorney" for purposes of

---

[25] The district court stated that "there is no evidence that Defendants provided any such assurances to BlueRadios," but again, we aren't so certain that the character of HBSR's responses to Klobucar's letter couldn't be read as assurances.

accrual. Levin, 728 F.2d at 553. That may be a correct statement of law, but again, we don't see how it's decisive here.

By now, we've stated over and over that it's a jury question whether BlueRadios knew enough to trigger accrual by this moment. We've held that reasonable people could disagree about the import of all those facts as they relate to BlueRadios' knowledge; put differently, it is a debatable question whether BlueRadios knew enough to have the clock start ticking. So we don't think it makes much sense to hold that Klobucar -- operating with, at most, the same knowledge of those facts -- had in November 2014 such a materially superior grasp of the circumstances for the clock to start as a matter of law.

For another, the district court stated in a footnote that it was "undisputed that Klobucar understood the material relationship" between Kopin and BlueRadios (insofar as he read the contract) and that he "understood that the Law Firm submitted the patent applications." But the district court (in our view) gave those facts too much weight for summary judgment purposes. That Klobucar knew some background and that he found the patents and applications (as reflected in his list) is not to say that he knew, with the kind of certainty necessary for summary judgment to be appropriate, that some semblance of foul play was afoot. See Rosen Constr., 364 F.3d at 405-06; Levin, 728 F.2d at 554; see also Williams, 668 N.E.2d at 804 (explaining how the clock does not

start "until the plaintiff knows or reasonably should know that he or she has been harmed by the defendant's conduct").

Again, we've got to look at this in the light most favorable to BlueRadios. And from that perspective, Klobucar's mission was quite narrow; he described his task as only a "basic review to determine if, indeed, there was an assignment and if there was an assignment, to whom the assignment pertained." But (at least in BlueRadios' plausible presentation of the record) at no point before December 5, 2014 (again, the drop-dead date) had any meeting of the minds occurred between Klobucar and BlueRadios, nor had Kramer asked Klobucar to evaluate, critique, or attempt to correct anything HBSR had done or failed to do.

Yet it seems that HBSR wants to charge BlueRadios with complete knowledge just because Klobucar and BlueRadios each had incomplete knowledge that could eventually add up to complete knowledge. We don't see anything in the caselaw requiring us to undertake the complicated metacognitive arithmetic (some knowledge in client + other knowledge in attorney = enough knowledge in client) that's necessary to accept that argument. Instead, we only read the law to say that if Klobucar knew everything, the statute of limitations would start running and BlueRadios' claims would be untimely. See, e.g., Levin, 728 F.2d at 553 (holding that a client is on notice of their past attorney's conduct when

the client's current attorney sends a letter to the past attorney accusing him of "alleged errors").

All that's to say: reasonable people could disagree about the import of the facts in the November-December 2014 timeline, so this question is (like the others) better left for the jury.

**v**

So, if not prior to December 5, 2014, when could the legal malpractice claim have accrued?[26]

BlueRadios submits that accrual didn't happen until spring 2017, because then -- and only then -- things came out during discovery in the Colorado-based BlueRadios-Kopin litigation to alert everyone at BlueRadios of HBSR's unscrupulousness (as distinct from Kopin's). To support that proposition, BlueRadios offers a declaration from Kramer stating that BlueRadios "obtained discovery about Kopin's communications with HBSR, and certain portions of HBSR's file." We assume based on context clues -- but BlueRadios does not tell us outright -- that the discovery included the specific internal documents between Kopin and HBSR that we referenced earlier. Those documents stated that Kopin and

---

[26] The question matters because, "if a defendant pleads the statute of limitations and demonstrates that the action was commenced more than three years after the date of the plaintiff's injury, the plaintiff has the burden of proving that the facts take the case outside of the statute of limitations." Williams, 668 N.E.2d at 804 (cleaned up).

HBSR "need to tell" BlueRadios about abandoning one application and that another change "may require" BlueRadios' approval (though approval was never sought and notice was never given). They may also have included information about the possibly improper financial intertwinement between HBSR and Kopin.

We think that theory's plausible. Put differently, "viewing all of the facts and their reasonable inferences in the light most favorable" to BlueRadios, "we find that a reasonable factfinder could conclude that the earliest" BlueRadios "knew, or should have known," that HBSR had schemed with Kopin to deprive BlueRadios of its rights was spring 2017. That was "well after the operative date" of December 5, 2014, "set forth in the standstill agreement." Rosen Constr., 364 F.3d at 413. So this accrual question, like others, is better left for the jury.

**vi**

Absent so far from our discussion is BlueRadios' argument (supported by amicus Professor Robinson) that misstating inventorship in a patent application cannot constitute the harm necessary for limitations to accrue. But, as the past pages indicate, we don't need to reach this issue of first impression to find in BlueRadios' favor, so we decline to wrestle with it today. Or, more simply, we don't touch it because "we need go no further." United States v. Gray, 814 F.2d 49, 52 (1st Cir. 1987) (cleaned up) (first recorded instance of this classic Selya-ism).

* * * *

That concludes our discussion of the discovery rule for the accrual of legal malpractice claims.  We'll note here that the district court seemed to assume that the discovery rule operated the same way for all of BlueRadios' claims.  Below, BlueRadios argued that subtly different accrual rules applied to each claim, but the district court didn't (by our lights) address that argument.  And on appeal, it seems that everyone assumed the discovery rule operated the same way across all the claims.

We're unwilling to enshrine that assumption into law today.  Our holdings are thus limited to the legal malpractice claim.  We aren't well-positioned to take the first stab at the question of whether the accrual rules for other claims operated in the same way.  So we see the most natural disposition of the case as this: we **<u>reverse</u>** the district court's holding that the legal malpractice claim was untimely as a matter of law, but only **<u>vacate</u>** the district court's determinations of untimeliness as to the other claims (such as the breach of fiduciary duty, fraudulent nondisclosure, and Chapter 93A claims) and **<u>remand</u>** for further consideration based on the analysis we've provided above.

## B. Attorney-Client Relationship

Having settled the timeliness issue, we next turn to whether an attorney-client relationship existed between BlueRadios and HBSR.  We remind the reader that here, we're actually dealing

with cross-motions for summary judgment, as each party sought it in their favor below on this issue; that, however, does "not change the standard." Latin Am. Music Co. v. Archdiocese of San Juan of Roman Cath. & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007).

BlueRadios rails against the district court's holding that it never formed an attorney-client relationship with HBSR. In its view, HBSR had to be BlueRadios' attorney to represent the company throughout the Golden-i patent prosecution process; that settles the issue as a matter of law (at least in BlueRadios' view). And even if that alone doesn't seal the deal, BlueRadios offers that, in totality, it and the other circumstances at play here do establish the relationship as a matter of law; in the alternative, BlueRadios offers that reasonable minds could differ as to whether there was an implied attorney-client relationship, so summary judgment for HBSR was inappropriate.

HBSR counters by first arguing that BlueRadios never made a concrete communication requesting representation or individualized legal advice. The patent prosecution was insufficient (says HBSR) in large part because HBSR did it at Kopin's request, not BlueRadios'. And either way, HBSR says that it never provided any individualized legal advice in response to a request from BlueRadios. It sees each of those points as dispositive in its favor.

Before we dive into our analysis, we offer another quick primer, this one on attorney-client relationships under Massachusetts law. For starters, there are two main types of relationships: those that "rest on an express contract" and those that are "implied as a matter of law." Cesso v. Todd, 82 N.E.3d 1074, 1078 (Mass. App. Ct. 2017) (cleaned up). The district court and the parties agree that there was no written or express agreement establishing an attorney-client relationship between BlueRadios and HBSR.

So we ask whether there was an implied attorney-client relationship. In DeVaux v. American Home Assurance Co., 444 N.E.2d 355, 357 (Mass. 1983), which the parties and the district court agree controls here, the S.J.C. set out three necessary elements for an implied attorney-client relationship:

1.   A person seeks advice or assistance from an attorney;

2.   The advice or assistance sought pertains to matters within the attorney's professional competence; and

3.   The attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.

See id. Reasonable but detrimental reliance on an attorney's advice also satisfies the third prong. Id. And "where reasonable persons could differ as to the existence of an attorney-client

- 45 -

relationship, this issue must be resolved by the trier of fact." Id. (cleaned up).

## ii

Recall how the district court held that BlueRadios failed on the first prong. It reasoned that BlueRadios' contract with Kopin and its communications with HBSR did not pass muster. And the district court ended the analysis there, not reaching the second or third prongs. We see things differently, keeping in mind that we must undertake our inquiry "under the totality of the circumstances." Sheinkopf v. Stone, 927 F.2d 1259, 1265 (1st Cir. 1991).

It's true that Prong One of the DeVaux test requires "concrete communication by the plaintiff requesting that the attorney represent him, or explicitly seeking individualized legal advisement." Int'l Strategies Grp., Ltd. v. Greenberg Traurig, LLP, 482 F.3d 1, 8 (1st Cir. 2007). But, contra the district court, we see just that in the record.

We'll start with the contract between BlueRadios and Kopin, as the district court did. To rule against BlueRadios on Prong One, the district court seemed to lean heavily on the fact that "BlueRadios contracted its ability to determine what patents would be prosecuted to Kopin under the [c]ontract."

But that isn't dispositive. As the Colorado district court explained, Kopin's decision to bring HBSR aboard must be

read considering the BlueRadios-Kopin agreement.  See Sheinkopf, 927 F.2d at 1265.  And under their contract, it was Kopin's responsibility to select counsel for the Golden-i project, but "the selection and retention of HBSR was for the common undertaking of the parties."  BlueRadios, Inc., 2017 WL 11546716, at *3.[27]  And this responsibility was no surprise to HBSR, who reviewed the contract before signing on, specifically billing that it studied "assignment of rights and licensing provisions" in the contract.  Through that, it would have read (and thus understood) that BlueRadios and Kopin jointly owned the IP for Golden-i.  It then opened BlueRadios billing files and helped them get the patent application process going.[28]  As the Colorado court put it, "HBSR was completely aware that it was acting as [the] attorney for both parties in so far as the preparation, filing, and perfecting of rights in the patent applications was concerned."  Id. at *2 (cleaned up).  So the initial request came through Kopin, but it came for BlueRadios, too; put differently, the request came with the knowledge that Kopin and BlueRadios were a package deal.

---

[27] Kopin suggests that we should discount the Colorado court's order because its factual findings were limited to disqualification and because it happened early in the litigation. To be clear: we know the order doesn't bind us, but we see no reason to discount its persuasive and highly relevant reasoning.

[28] As we previously noted, we don't see any evidence of direct billing to BlueRadios, despite the billing files bearing its name. That fact, however, doesn't prove dispositive against the great weight of the record.

- 47 -

To embrace the alternative -- that BlueRadios waived any and all rights of representation in this joint endeavor just because Kopin had the responsibility to take the lead on attorney engagement for the both of them -- is to conflict with commonsense principles of joint representation. See, e.g., Merck Eprova AG v. ProThera, Inc., 670 F. Supp. 2d 201, 211 (S.D.N.Y. 2009) ("Where counsel is engaged by two or more clients to represent them jointly in a matter, it is unrealistic to expect that each client will necessarily execute a separate retainer agreement, communicate with counsel independently, or provide individual payment for services rendered.").

The district court next explained that BlueRadios' communications with HBSR "do not establish individualized requests for legal advice." We disagree. We think that error comes, in part, from the district court's misapprehensions about the underlying contract. But anyway, once Kopin had selected HBSR for the Golden-i project, the record shows that BlueRadios sought and received specific "assistance." DeVaux, 444 N.E.2d at 357 (cleaned up). Some examples of this back-and-forth:

- BlueRadios met with HBSR to discuss Golden-i without Kopin present;

- BlueRadios shared confidential information and trade secrets with HBSR to aid the prosecution of patents on its behalf (as well as Kopin's);

- BlueRadios executed a power of attorney for HBSR;

- HBSR filed a patent listing only BlueRadios' employees (the '177 Application);

- HBSR filed more patents listing both BlueRadios and Kopin folks; and

- BlueRadios requested that HBSR broaden the scope of a claim of a patent about WiFi technology.

Read together and in the context of the BlueRadios-Kopin contract, all this conduct clearly reflects how concrete requests for assistance were made -- and, as relevant to Prong Three, were often followed through on. See, e.g., Page v. Frazier, 445 N.E.2d 148, 152 (Mass. 1983) (noting how "the relationship can be implied from the conduct of the parties" (citing DeVaux, 444 N.E.2d at 357)); see also Restatement (Third) of the Law Governing Lawyers § 14 cmt. c (2000) ("The client's intent may be manifest from surrounding facts and circumstances, as when the client discusses the possibility of representation with the lawyer and then sends the lawyer relevant papers or a retainer requested by the lawyer.").

We'll detail a couple specific points insofar as the parties disagree about them. As to prosecuting patents, we've previously held that an attorney-client relationship arises from that act. See Mass. Eye & Ear, 412 F.3d at 225-26 (affirming the district court's order that an attorney-client relationship formed

during patent prosecution process, at least for privilege purposes). Though that case arose in a slightly different context, we think it puzzling that the district court reached the opposite conclusion, particularly given that there seems to be a consensus of district courts that have largely held along the same lines as we did. See, e.g., Naturalock Sols., LLC v. Baxter Healthcare Corp., No. 14-cv-10113, 2016 WL 2958374, at *2 (N.D. Ill. May 22, 2016) ("Courts have long held that an attorney-client relationship exists among clients and attorneys allied in a common legal cause, such as the prosecution of a patent." (collecting cases)). Indeed, we think the facts undergirding the joint patent prosecution process are especially helpful in determining that HBSR was BlueRadios' attorney in 2008-09.[29]

As to filing a power of attorney (a discrete part of the patent prosecution process), we have previously suggested it is relevant (but not dispositive) in the analysis and favors an implied attorney-client relationship. See Int'l Strategies Grp., 482 F.3d at 8 (explaining how "the power of attorney may have some impact on our analysis of whether an implied attorney-client

---

[29] That the patent applications listed BlueRadios employees rather than BlueRadios is of no moment to us, given (1) that those employees had all assigned their rights to BlueRadios and (2) that the contract HBSR read shows that HBSR knew it was working on BlueRadios' behalf.

relationship was formed").  So it's not a "smoking gun" fact, but surely another point in BlueRadios' favor.

To reach the opposite conclusion, the district court relied on Sun Studs, Inc. v. Applied Theory Associates, Inc., 772 F.2d 1557, 1568 (Fed. Cir. 1985), for the proposition that "a power of attorney does not ipso facto create an attorney-client relationship."  Sun Studs dealt with a company, Applied Theory Associates, Inc. ("ATA"), that tried to claim it was a firm's client in large part because ATA's owner granted the firm a power of attorney during patent prosecution.  Id. at 1567.  We'll set aside some important differences we see, such as the fact that the underlying contract there (between ATA and Sun Studs, the firm's undisputed client) stated that "all rights in inventions arising from ATA's consulting work were to be assigned to Sun Studs" -- a stark contrast to the Golden-i contract establishing that BlueRadios and Kopin jointly owned Golden-i IP.  Id. at 1569.  And we'll also set aside that Sun Studs is out-of-circuit caselaw that doesn't bind us.  See, e.g., United States v. Mitchell, 432 F.2d 354, 356 (1st Cir. 1970) (explaining how "the decision of another circuit is not controlling here").  Here's the critical reason Sun Studs is distinguishable: the power of attorney there, as we read it, was really the only affirmative hook between ATA and the law firm.  Id. at 1568 (noting ATA's argument that "prior representation is established by [the owner's] power of attorney

to the [law] firm for prosecuting the application which resulted in the '579 patent").  As we've made clear by now, plenty more connects BlueRadios directly to HBSR.

We also think the BlueRadios-Kopin-HBSR arrangement contrasts with the arrangements found in other cases that the district court cited, where we found that no proper request for assistance was made.  In Sheinkopf, we rejected an attorney-client relationship when the appellant's "assertion that such a relationship came into being rest[ed] on little more than his subjective belief, bolstered only by his recollection of a general conversation, unanchored in time or place, concerning his desire to avoid personal liability."  927 F.2d at 1266.  And in International Strategies Group, the appellant at least twice "acknowledged that it was not [the attorney's] client."  482 F.3d at 9.  And those acknowledgments "were consistent with [the attorney]'s advisement to [the appellant] on at least two occasions that [the attorney] represented [the other joint venture member] alone."  Id.

Given the facts we identified above, we see the active engagement and collaboration between HBSR and BlueRadios in the joint endeavor of the Golden-i project as worlds away from these cases. After all, we've explained that the concrete communications rule has a straightforward purpose: to ensure that a lawyer-client relationship is founded on "more than an individual's subjective,

- 52 -

unspoken belief that the person with whom he is dealing, who happens to be a lawyer, has become his lawyer." Sheinkopf, 927 F.3d at 1265. That isn't this case.

So too with Robertson v. Gaston Snow & Ely Bartlett, 536 N.E.2d 344 (Mass. 1989), another case that HBSR points to. The court there boiled the plaintiff's claim down to the fact "that he thought that Gaston Snow represented him but that he failed to communicate this thought to anyone." Id. at 523. And the law firm there never indicated to the plaintiff that it "was representing his interests." Id. at 522. Not so here, given that HBSR (1) read the contract and knew that IP filings were on behalf of Kopin and BlueRadios and then (2) filed patent applications on BlueRadios' behalf.

HBSR makes a few more arguments to the contrary, but none persuade us. For one, it makes a mountain out of a molehill insofar as it argues that BlueRadios admitted (in summary judgment papers) that it, in HBSR's words, "never requested individualized legal advice or representation." That BlueRadios admitted that the requests were not "individualized" is semantical. In the paragraph preceding the admission, BlueRadios states that it "requested advice and assistance from HBSR on numerous occasions," and in the paragraph following the admission in question, BlueRadios further explains how it sought legal advice on a host of things. So when held against the "totality of the

circumstances" here (as is necessary), that admission does not move the needle. Sheinkopf, 927 F.2d at 1265.

Next, HBSR takes aim at the sharing of confidential information, saying that it can't be a basis for the relationship because BlueRadios shared that information with Kopin, too. "But that is hardly the point." BlueRadios, Inc., 2017 WL 11546716, at *2. As the Colorado court put it, any "confidentiality was not impugned because it was obtained in connection with the underlying collaborative agreement and HBSR's obligations extended to both parties that it was indubitably representing." Id. And anyway, this sharing alone wasn't what triggered the relationship -- it's one of many facts favoring BlueRadios in this "totality of the circumstances" analysis. Sheinkopf, 927 F.2d at 1265.

Third, HBSR fusses that BlueRadios is co-opting Kopin's requests for legal advice as its own. But we think the record belies that assertion. After all, "the Patent Applications and Golden-i technology were jointly owned by BlueRadios and Kopin and HBSR was completely aware that it was acting as attorney for both parties in so far as the preparation, filing, and perfecting of rights in the patent applications was concerned." BlueRadios, Inc., 2017 WL 11546716, at *2 (cleaned up).

Fourth, HBSR gripes that actual requests for legal advice cannot be implied, and all of BlueRadios' requests were implied. But again, the record provides otherwise; the facts above

that we've identified show how the interactions between BlueRadios and HBSR were neither implied nor subtle.  Like we said, there is far "more than an individual's subjective, unspoken belief that the person with whom he is dealing, who happens to be a lawyer, has become his lawyer" to support our holding here.  Sheinkopf, 927 F.3d at 1265.

Fifth and finally, HBSR insists that the WiFi technology request (one of our bullet points from above) can't count as an individualized request just because of the "individualized" admission about which we previously discussed.  Yet we see no reason that HBSR's semantics about the word "individualized" in that admission (overemphasizing similar language in a past opinion of ours) should carry the day against the totality of the record.  See Nat'l Pork Producers Council v. Ross, 598 U.S. 356, 373 (2023) ("The language of an opinion is not always to be parsed as though we were dealing with language of a statute." (cleaned up)).

So we hold that BlueRadios has satisfied Prong One of the DeVaux test as a matter of law.

### iii

Because no one disputes Prong Two of the test (that "the advice or assistance sought pertains to matters within the attorney's professional competence"), we'll move straight into the third.  DeVaux, 444 N.E.2d at 357 (cleaned up).

And under Prong Three, the inquiry is whether HBSR "expressly or impliedly agree[d] to give or actually g[ave] the desired advice or assistance," or (in the alternative) if BlueRadios "reasonably relie[d] on" HBSR "to provide" legal services, and HBSR, "aware of such reliance, [did] nothing to negate it." Id.

The district court did not reach this prong, but BlueRadios satisfies it rather easily under either approach. As to giving the "desired advice or assistance," the record's teeming with evidence of that (as our bullet point list from above suggested). Id. (cleaned up). HBSR filed several patents on behalf of both BlueRadios and Kopin, and at least in one instance just on behalf of BlueRadios, and other times met solely with BlueRadios. That's sufficient. See Mass. Eye & Ear, 412 F.3d at 225-26; Naturalock Sols., 2016 WL 2958374, at *2; see also BlueRadios, Inc., 2017 WL 11546716, at *2 ("HBSR was completely aware that it was acting as attorney for both parties in so far as the preparation, filing, and perfecting of rights in the patent applications was concerned." (cleaned up)).[30]

_____

[30] HBSR laments that these cases (and others that BlueRadios relies on) didn't arise in the DeVaux context. To be clear: we think BlueRadios satisfies the DeVaux test on its own terms, but we also think it laid out a persuasive response during oral argument. As counsel for BlueRadios explained, "You can't say I'm your attorney as to discovery of documents or when it comes to disqualification but not when it comes to an actual malpractice claim." While BlueRadios must, of course, satisfy each test

- 56 -

HBSR attempts to cast BlueRadios as an "incidental" beneficiary "from HBSR's provision of legal services to Kopin." But we think that claim is baffling considering the record before us: the contractual provisions giving BlueRadios joint rights to the IP, the communications between BlueRadios and HBSR, and the applications filed jointly for Kopin and BlueRadios. BlueRadios was far from the putative client whose case hinged merely on the "expectation" that they "would be an eventual financial beneficiary" of the lawyer's actions. Int'l Strategies Grp., 482 F.3d at 10.

And in the alternative, as to whether there was reasonable reliance, we think the Colorado district court put it best:

> In this case the contract between Kopin and BlueRadios shows the parties' clear understanding that Kopin would undertake the necessary steps to obtain patents on jointly developed technologies for the benefit of both itself and BlueRadios. BlueRadios had every reason to believe, and none to disbelieve, that HBSR was retained to pursue that common endeavor. That BlueRadios was in direct contact with HBSR regarding the prosecution of patents for its benefit and gave directions to HBSR on the patentability and substance of the applications as well as relying on the legal advice of HBSR demonstrates the foundation of the trust that is the essence of the attorney/client relationship.

separately, it would be strange indeed to have such disparate outcomes.

BlueRadios, Inc., 2017 WL 11546716, at *3 (cleaned up). We need not belabor the point further.

To cut against a reasonable reliance position, HBSR primarily relies on how BlueRadios still occasionally referred to HBSR as "Kopin's patent attorney" and "Kopin lawyers" during the patent prosecution process. True, but when held against the "totality of the circumstances" (including, in filing applications on BlueRadios' behalf, a representation that HBSR "is authorized to represent the particular party on whose behalf he or she acts," 37 C.F.R. § 1.34), that one fact cannot save HBSR. Sheinkopf, 927 F.2d at 1265.

Because BlueRadios has satisfied Prongs One and Three and we see no contest about Prong Two, we hold that HBSR had an attorney-client relationship with BlueRadios under DeVaux as a matter of law.

We reach this conclusion mindful of the posture of this issue -- cross-motions for summary judgment -- and our corresponding obligation to evaluate BlueRadios' motion for summary judgment (as distinct from HBSR's parallel motion) de novo, and thus to view the facts in the light most favorable to HBSR and to draw all reasonable inferences in its favor. See Gibson Found., Inc. v. Norris, 88 F.4th 1, 5-6 (1st Cir. 2023). Even still, we don't find HBSR's arguments persuasive, and we believe no reasonable jury could reach the conclusion that HBSR seeks, so

summary judgment in BlueRadios' favor on this issue was warranted. Cf. Mesnick v. Gen. Elec. Co., 950 F.2d 816, 829 (1st Cir. 1991) ("Because we do not believe a reasonable jury could find in the plaintiff's favor . . . summary judgment was proper."). The upshot of all that is that BlueRadios' partial motion for summary judgment should have been granted on this issue and HBSR's should have been denied.[31] We thus **reverse** the district court's decision to grant HBSR's and deny BlueRadios' respective motions.

## C. Equitable Tolling

So far, we've held that questions about timeliness are better suited for the jury and that BlueRadios and HBSR had an attorney-client relationship as a matter of law. One last point remains. BlueRadios argues that, on the chance its claims aren't timely, two equitable tolling doctrines -- the "continuous representation" doctrine and the "fraudulent concealment" doctrine -- still save the claims. The district court disagreed

---

[31] Two more points on this issue. First, in just a footnote in the attorney-client section of its brief, BlueRadios contests the district court's separate holding that summary judgment was appropriate against one of the partners, Lawrence Cogswell, because he "never communicated with BlueRadios" and was not a partner at the firm at the time. "We have repeatedly held that arguments raised only in a footnote . . . are waived." Tax-Free Fixed Income Fund for P.R. Residents, Inc. v. Ocean Cap. LLC, 137 F.4th 6, 24 (1st Cir. 2025) (cleaned up). The same goes for this one.

Second, because we find for BlueRadios on the attorney-client relationship question, we don't need to get into the other agency arguments it makes.

and declined to apply either, and that decision is part of what BlueRadios appeals.

But by now, we've already held that many of the factual disputes that application of these doctrines hinges on are questions better left for the factfinder. That's good enough for BlueRadios at this stage of the litigation, because it means that its claims don't need equitable tolling to get to the jury.[32] So we need not entertain the applicability of the tolling doctrines at the summary judgment stage.

## PARTING THOUGHTS

The district court's decision is thus **reversed in part** (as to the legal malpractice claim's timeliness and the attorney-client relationship question) and **vacated in part** (as to the other claims' timeliness). We **remand** for more litigation consistent with this opinion. Appellees shall bear costs.

---

[32] Whether equitable tolling would be appropriate if (1) the case made it to trial and (2) the jury found the claims untimely is possibly a question for another panel on another day.